[Civ. No. 3792. Fourth Dist. June 8, 1949.]

WESTERN GULF OIL COMPANY (a Corporation) et al., Appellants, v. THE SUPERIOR OIL COMPANY (a Corporation) et al., Respondents.

Harvey, Johnston, Baker & Palmer, Claude F. Baker, J. A. McNair, R. K. Barrows, James G. Leovy, David Proctor, Archie D. Gray, Walter C. Clemons, Robert E. Hardwicke, D. H. Culton and S. A. L. Morgan for Appellants.

H. T. Sutherland, A. M. Gee and Calvin A. Brown as Amici Curiae on behalf of Appellants

Hanna & Morton, E. A. Penprase, Harold C. Morton, Borton, Petrini, Conron & Borton, R. R. Von Hagen, W. Joseph McFarland, Gibson, Dunn & Crutcher, Norman S. Sterry, Henry S. Prince, Dockweiler & Dockweiler, Thomas A. J. Dockweiler, Mortimer A. Kline, West, Vizzard & Howden,

Robert W. Walker, L. W. Butterfield, Calvin Conron, Lynn O. Hossom, Mervyn W. Phelan, Robert L. Lipman, Burnham Enersen, Felix F. Stumpf, McCutchen, Thomas, Matthew, Griffiths & Greene, J. E. Woolley, Vincent J. McGovern, Briggs & Briggs and Herbert W. Clark for Respondents.

GRIFFIN, J.—This is an appeal from a judgment of dismissal in an injunction proceeding after sustaining general demurrers to the complaint without leave to amend. The plaintiffs are Western Gulf Oil Company and the Texas Company. One group of defendants are The Ohio Oil Company, General Petroleum Corporation of California, Union Oil Company of California and Barnsdell Oil Company, and will hereinafter be referred to as "unit operators" with plaintiffs. Defendants The Superior Oil Company, Lloyd Corporation, Limited, Pacific Western Oil Corporation, Chanslor-Canfield Midway Oil Company, The Hancock Oil Company, and Richfield Oil Corporation are referred to as "non-unit defendants." The other defendants mentioned in the complaint are landowners or royalty owners and are referred to as "nonoperating defendants."

There was discovered in Kern County the "Paloma Oil Field," about six years before the filing of this action. It is a condensate field and the entire area covers approximately 20 square miles. The unit operators are the owners of the sole and exclusive right to drill and operate for oil and gas within a described area, referred to as the "unit area," and each of the nonunit defendants is the owner of similar rights within other described areas. These areas overlie a common source of supply of oil and gas referred to as the "Reservoir." In addition, there are certain areas overlying the reservoir in which some of the unit operators hold exclusive drilling and operating rights but which are not a part of the land operated as a unit. The rights of each operator are limited and affected by similar and correlative rights of the others. The nonoperating defendants are landowners or royalty owners without present operating rights.

According to the allegations of the complaint, as epitomized by cousel for plaintiffs, the free gas in the reservoir contains, as a component part thereof, large quantities of hydrocarbons which under ordinary surface pressure and temperature conditions would be fluids. They are maintained in gaseous form, intermixed with the other gas, only because of the exceptionally high pressures. At lower pressures, these hydro-

carbons become liquids—in other words, they condense. This free gas containing condensate is concentrated in one part of the reservoir, referred to as the "Condensate Area." As the pressures under which this gas is held are reduced, condensation occurs. The condensation resulting from such pressure decline is known as "retrograde condensation." When such condensation occurs, the resulting liquids are precipitated at progressively accelerated rates into the interstices between the grains or particles of sand in the underground formation. Only a very small part of these precipitated liquids can be recovered by any practicable method of operation. To minimize this precipitation and consequent wastage, it is necessary to maintain the pressure in the reservoir at as high level as practicable, and in this manner make possible the production of liquefiable hydrocarbons while they remain in gaseous form. Pressure declines resulting from production of fluids from the reservoir have already caused precipitation of some liquids into the formation, but the pressures are still at sufficiently high levels to hold the greater part of the liquefiable hydrocarbons in the gaseous phase. The quantity of gas in the reservoir is in excess of one trillion cubic feet; and the recoverable liquefiable hydrocarbons in the condensate gas are in excess of 88,000,000 barrels. The part of the reservoir outside of the condensate area contains crude oil, referred to in the complaint as "black oil." This black oil holds in solution large quantities of gas, called "solution gas." The solution gas adds to the fluidity and mobility of the black oil and furnishes energy to propel the black oil to the well bore. The quantity of solution gas retained in the black oil is dependent upon the prevailing formation pressure. In order to produce maximum quantities of black oil, good production practice requires that the solution gas be kept within the black oil until it has performed its functions. The maintenance of pressure in the condensate gas area is a further aid to the production of the black oil. The maintenance of high pressures in the reservoir is of utmost importance, not only to prevent condensation in the reservoir, but also to produce the maximum quantity of black oil. It is alleged that prudent and efficient producing operations and sound engineering practices, as an effective means of maintaining high pressures within the reservoir, require the return to the reservoir, at proper locations and at pressures exceeding pressures in the reservoir, of all the gas produced therefrom and remaining

after processing for the removal of liquefiable constituents, except the small amount used for fuel in lease and plant operations. This is called "cycling," and by means thereof the above-described losses can be kept at a minimum. The complaint then states that the proper distribution of producing wells is an important factor in cycling; that cycling is more effective if the reservoir is treated as a single entity without regard to property lines, as if it belonged to one owner; that the development and operation (including cycling) of the reservoir as a unit in an efficient manner consistent with sound engineering practices would result in the production of at least 61,000,000 barrels more than could· otherwise be produced; that this represents the quantity that would be wasted in the ground and its value at today's prices exceeds $166,000,000; that plaintiffs' shares of this loss would be in excess of $66,000,000; that plaintiffs and the other unit operators have, at great cost and expense, erected a cycling plant and are carrying on cycling operations on their lands, but the other operators have refused to cycle; that while this cycling in part of the reservoir by the unit operators has materially increased the recovery of black oil and other liquid and liquefiable hydrocarbons from the common reservoir, as compared with what would have been recovered had their gas not been returned, such cycling is driving the condensate gas and black oil from the high pressure areas of the unit area into areas from which the nonunit defendants are producing, to the irreparable damage of plaintiffs and the other unit operators; that the nonunit defendants are producing on a large scale without returning to the formation any of the gas (solution or condensate) produced by them, and without extracting the liquefiable hydrocarbons; that such gas, except a small quantity used as fuel, is sold and transported out of the field; that Richfield has only recently commenced its operations; but the others have been so operating for several years and Richfield is returning no gas to the reservoir; that it is drilling other wells, and, unless prevented, will continue to operate without returning gas to the reservoir, and will continue the same wasteful practices now being followed by other nonunit defendants. It is further alleged that there is, and has been for several years, an acute and serious shortage of oil and other hydrocarbons in the United States, particularly in California; that public policy, and the protection of private rights of plaintiffs, require that the court enjoin the nonunit defendants from continuing the unreasonable, profligate,

and wanton waste in the reservoir of recoverable oil and other hydrocarbons; that their wasteful practices cause a pressure gradient toward their wells from the unit area, with consequent drainage of tremendous quantities of condensate gas, black oil, and solution gas away from the unit area, where pressures are being maintained, to areas from which nonunit defendants are producing; that if such operations continue, the unit operators cannot prevent the continuance of the enormous losses they are sustaining by this migration and drainage, and cannot materially increase their proportion of total production from the reservoir, unless they abandon cycling and resort to the same wasteful practices and methods as those of the nonunit defendants. Then follows the claim that plaintiffs are reluctant to abandon cycling and resort to such wasteful practices; but, in order to prevent great damage through drainage to wells of the nonunit defendants, they will be forced to do so unless the nonunit defendants be required to cease their wasteful operations; that maximum ultimate recoveries and sound practices require unit operations and division of the products produced and the costs of operations can be made so as to adjust and protect correlative rights; that such a proposal was made to the nonunit defendants, other than Richfield, but was rejected by them and the only counterproposal was one by Superior which involved a participation by it on a basis that would allot to it a part of the total production equal in value to more than twice the value of the recoverable oil and gas and other hydrocarbons under the leases; that none of the other nonunit operators would agree to any plan unless Superior became a party thereto; and that the plan proposed by the unit operators was fair and equitable, would prevent the profligate waste now occurring and would fully protect the correlative rights of all interested parties; that plaintiffs are still ready to enter into such a plan or in the alternative, they are ready and willing and, in an effort to do equity, they offer to enter into any other plan of unit operation which will require the return of the residue gas to the reservoir, so long as economically feasible under sound engineering practices, will prevent waste effectively, and will protect the correlative rights of all; that without complete unitization, even though all should return their gas to the reservoir, correlative rights cannot be protected unless the nonunit defendants are restricted to their fair and equitable share of the total production from the reser-

voir; that too rapid rate of production by any operator would involve uneconomic expenditures for drilling and equipping unnecessary wells and for installing excessive plant facilities; that such uneconomic and unnecessary expenditures could be amortized only by producing and appropriating hydrocarbons not now underlying the lands in which the operator owns operating rights, to the damage of adjoining owners and in violation of the right of the latter to produce their fair share of such hydrocarbons at rates dictated by sound engineering and economic practices and considerations; that the nonunit defendants and each of them, unless enjoined by the court, will continue their wasteful practices and will continue to take and appropriate from the reservoir hydrocarbons enormously in excess of the proportions thereof to which they are fairly entitled, in violation of the correlative rights of plaintiffs and the other unit operators and those owning royalty rights in the unit area.

It is then alleged that plaintiffs have no adequate remedy at law; that the nonoperating defendants, though not conducting operations themselves, are the beneficiaries of such operations, they being the lessors, royalty owners, or landowners, and they are joined in order that they may be bound by the decree.

In support of their contention plaintiffs also allege that injection wells should be located with regard to the structural features of the reservoir and without regard to property lines, and to protect all of the owners of lands and leasehold estates embracing the reservoir "in their correlative rights in the Reservoir and its contents," the entire reservoir should be unitized and treated as a single entity *without regard to property lines,* in exactly the same manner as would be the case if the entire field or reservoir belonged to one owner; that along with such unitized operation, provision should be made for the equitable distribution of the hydrocarbons recovered from the entire reservoir "in conformity with the correlative rights of the owners of the lands embracing the entire Reservoir," without any regard to the particular tracts of land under which the hydrocarbons are now situated and without regard to the tracts of land in which the wells may be drilled to produce and recover the hydrocarbons from this field.

It is then alleged that after discovery of the field the appellants and the other unit operators, recognizing that wastage would result if the residue gas were not returned to the reservoir, entered into a unitization agreement with respect to their properties and have erected, at great cost, a cycling

plant in this field, and they have injected and now are injecting into the reservoir all of their residue gas; that the plaintiffs and the unit operators are injecting their residue gas to the structurally high portions of the reservoir, where the unit operators have the exclusive rights to drill, and this causes a migration of condensate oil and black oil in the unit area into the nonunit area; and that the nonunit operators sell all of their gas produced from their wells except for the amount used for fuel, and such gas is transported in pipe lines out of this field away to markets. It is alleged that this sale of gas produced by the nonunit operators is a wasteful practice in that the gas is not returned to the producing formations.

Plaintiff then prays: 1. That the court determine, find, and declare (a) the total quantity of each type of recoverable hydrocarbon within the reservoir and the gross value at the fair market prices above ground of each type of such recoverable hydrocarbons; (b) the total quantity of each type of recoverable hydrocarbon within the reservoir underlying each tract or parcel of land in which the operating rights are severally vested or owned by the unit operators and the nonunit defendants, and the gross value at the fair market prices above ground of each type of such recoverable hydrocarbon underlying each such tracts or parcels of land; (c) the rights of each nonoperating defendant in the reservoir; (d) the reasonable time over which the liquid and gaseous hydrocarbons should be produced in order to obtain, within reasonable economic limits and under sound engineering practices, the maximum recovery of hydrocarbons from the reservoir. 2. That the court determine, find, and declare from the evidence the most equitable and efficient method of operating the reservoir so as to prevent the waste of hydrocarbons in the reservoir and to protect and adjust the correlative rights of the interested parties. 3. That the court restrain and enjoin each defendant, and the heirs, legal representatives, successors, and assigns of each defendant, from producing any hydrocarbons, liquid or gaseous, from the reservoir unless and until such defendant shall conduct his operations to conform to the method determined, found, and declared by the court to be the most equitable and efficient in order to prevent the waste in the reservoir of hydrocarbons and to protect and adjust the correlative rights of all the interested parties. 4. In the alternative, plaintiffs pray that each non-

unit defendant, its successors and assigns, be restrained from producing any hydrocarbons, liquid or gaseous, from the reservoir, during such period as it shall be feasible, within economic limits under sound engineering practices, considering the reservoir as a whole, to cycle and restore the residue gas to the reservoir, unless and until such defendant injects all the residue gas produced by it from the reservoir into the reservoir in a manner which will effectively prevent waste of hydrocarbons in the reservoir and protect the correlative rights of all interested parties. 5. That before the conclusion of the trial plaintiffs be permitted to file a supplemental complaint alleging the damages sustained by them during the pendency of this action as a result of the continuance of the wasteful and wrongful practices of each defendant; and that damages be awarded to plaintiffs in such amounts. 6. That each non-operating defendant, his heirs, assigns, successors, and legal representatives be restrained and enjoined from asserting or claiming any breach of any covenant or condition, express or implied, of any of said leases held severally by plaintiffs and the operating defendants at variance with the terms and conditions of the judgment and decree entered herein, and that each be required in all respects to conform to and abide by the terms and conditions of such judgment and decree. 7. That plaintiffs have judgment for their costs and for such other and further relief in law and in equity to which they shall show themselves entitled in the premises. 8. That the decree herein provide that after entry thereof jurisdiction be retained by the court for the purpose of revising or supplementing the same in the event that conditions subsequently arising or discovered make such action necessary in order to further the ends of justice.

The trial court sustained general demurrers interposed by defendants. After plaintiffs indicated their lack of desire to amend, the demurrers were sustained without leave to amend. Judgment of dismissal followed and plaintiffs appealed.

■ In support of their claim that the complaint does state a cause of action it is argued (1) That it states a cause of action at *common law*. (2) That the use by the nonunit defendants of their property in such manner as to cause injury to the common reservoir and unreasonable waste of oil and gas infringed on the rights of plaintiffs and constitutes an actionable nuisance, both at common law and under the statutes. (3) That the complaint states a cause of action under the statutes of California, especially under sections

3106 and 3300 of the Public Resources Code which impose a duty upon operators to carry on their operations in a manner that will not cause unreasonable waste of gas or the loss of oil or gas, and the nonunit defendants have failed to conform to the statutory standards in this respect. (4) That a court of equity has the jurisdiction to protect the rights of the plaintiffs in the reservoir by enjoining the wasteful operations of the nonunit defendants or by prohibiting them from producing unless they refrain from causing unreasonable injury to the correlative rights of the plaintiffs. (5) That as to the nonoperating defendants, they are proper and necessary parties to this action.

It is true that this right of the individual to operate as he pleases in extracting oil and gas from his own land is being subjected to increasing control and limitation in the interest of the public and of correlative overlying owners. The restriction on unlimited drilling, provision for offset wells, requirement of capping of wells to prevent waste, shutting off water, control of ''reservoir energy'' and other similar regulations, which have been imposed on the developers of oil and gas lands in recent years, while largely based on public interest, is also founded on equitable principles which operate as between the private interests of the collective owners of adjoining lands overlying the reservoir.

Considerable reliance is had by counsel for plaintiffs upon the case of *Katz* v. *Walkinshaw*, 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236], involving the drawing off of percolating underground water and importing it to distant lands to the damage of adjoining property. It is argued that the common law principle of correlative rights, as established in that case, applies equally to oil and gas. We have examined the petition for rehearing in that case. It was there argued by petitioners that a rehearing should be had because the principle of law there stated in reference to correlative rights in percolating underground water might be held applicable to the rights of the owners of land to develop and sell oil.

In answering this question the court said, at page 137:

''It does not necessarily follow that a rule for the government of rights in percolating water must also be followed as to underground seepages or percolations of mineral oil. Oil is not extracted for use in agriculture, or upon the land from which it is taken, but solely for sale as an article of merchan-

dise, and for use in commerce and manufactures. The conditions under which oil is found and taken from the earth in this state are in no important particulars different from those present in other countries where it is produced. There is no necessary parallel between the conditions respecting the use and development of water and those affecting the production of oil. Whether in a contest between two oil-producers concerning the drawing out by one of the oil from under the land of the other we should follow the rule adopted by the courts of other oil-producing states, or apply a rule better calculated to protect oil not actually developed, is a question not before us and which need not be considered.''

It is apparent, therefore, that the case relied upon by plaintiffs is not determinative of any correlative rights respecting the rule that should be adopted as to oil production.

In *Ohio Oil Co.* v. *Indiana,* 177 U.S. 190, 210 [20 S.Ct. 576, 584, 44 L.Ed. 729], it is said:

''. . . the legislative power . . . can be manifested for the purpose of protecting all the collective owners, by securing a just distribution . . . and preventing it (the oil and gas) from being taken by one of the common owners without regard to the enjoyment of the others.'' (See, also, 31 Cal.L.Rev., p. 369.)

Stripped of all unnecessary minutiae, it appears to us the real question here involved is whether the courts of this state are authorized, or have the power and jurisdiction and are obligated to exercise such power and jurisdiction, if any, to determine the several questions of public policy which are here involved, including whether the repressuring of such a reservoir for increased future production is of greater value than its use for supplying present needs. Also, whether a court, notwithstanding the limited authorization heretofore furnished by the Legislature, has power to take over and superintend the operation of any and all oil fields by court decree, to compel a fixed distribution of oil produced regardless of the effort expended, and to require nonunit operators to expend large sums in boring wells and installing repressuring machinery on the property of others, all of which would be necessary in carrying out a unit operation of the entire field, according to the proposed plan or to any plan which would successfully bring about compulsory unitization.

Counsel for defendants have pointed out writings of Robert E. Hardwicke, one of the counsel for plaintiffs, a highly recognized authority on the subject of oil and gas, and oil and gas law (reported in 13 Mississippi Law Journal, 1941,

p. 407). He describes the difficulty attendant upon compulsory unitization and its doubtful legality or enforcement by a court. We adopt the words of the eminent author hereinafter quoted as most applicable to the facts here pleaded:

"It is freely admitted that unit operation of a field is a splendid thing. However, complications arising from compulsory unit operations are considered to be almost insurmountable. As observed above, if unit operation of a field is to be effective, the program should be formulated in the early stages of its history. Obviously, if the field is already drilled up, or substantially so, it is then too late to provide for unit operation. Let us assume, therefore, that several wells have been completed in an area which unquestionably constitutes a new field. Undoubtedly, there is available a reasonable amount of geological and geophysical data, giving some indication of the probable extent of the field. If, at this point, a hearing should be had before a regulatory agency for the purpose of formulating a program for unit operation of the field, whatever its extent and character, the program would have to provide for valuing in some way all properties within the limits found from meagre evidence to be within the productive area, or the program would have to provide some method for taking care of tracts later found to be productive or nonproductive, contrary to a previous classification. The program would have to provide money for drilling and operating wells, and for distribution of the allowable production at a time when few facts exist as to the relative values of properties. If exploratory wells should first be drilled, such fact finding procedure might cover a considerable period, and the owners and lessees of the land in the area would be deprived of the right to do their own drilling, and to secure immediate income.

"Beyond question, it would be found that changes would have to be made from time to time in the relative values of tracts, frequently requiring refunds by royalty owners and lessees. The many complications arising from entering an order requiring compulsory unit operations become apparent. The facts would be too meagre to permit findings as to relative values of properties supported by substantial evidence; consequently, it is extremely doubtful whether such an order would stand up in court. The chances are that it would be stricken down as being unreasonable, constituting an unwarranted regulation of property rights.

"It cannot be denied that a compulsory unit-operation order would restrict the use of property and the discretion of the

owners far more than does the usual type of conservation regulation now current. The ultimate recovery likely under a compulsory unit-operation program, as distinguished from a normal conservation program, would have to be very great before a court would hold that the extraordinary restrictions in the use of property which would take place under the compulsory unit-operation program were justified as a reasonable means of preventing waste and protecting rights. It is more likely the courts would hold that such restrictions were far beyond the necessities of the case.

"This much is certain: the merits of compulsory unit operations, as against reasonably efficient and effective control under existing conservation statutes, are not well enough established to overcome in legislative bodies the reluctance to give administrative agencies far greater powers than are now being exercised. I think it can be said that no compulsory unit operations law would have a chance to pass either in Congress or in any state legislature. Moreover, no regulatory agency is likely, under present state of knowledge, to issue a compulsory unit-operation order without being clearly directed by statute to do so."

As to the public policy involved, the Legislature of this state, in 1939, passed the California Oil and Gas Control Act, commonly known as the Atkinson Bill (Stats. 1939, ch. 811, p. 2368). The administration of the act was entrusted to an Oil Conservation Commission. By its terms the commission was authorized to limit and prorate the production of crude oil and natural gas and have general authority over the question of waste, both underground and surface, and production in excess of the reasonable market requirement. Pooling of properties was permitted and could be required in certain cases. The operation of this act was suspended by referendum. At the election the act and the policy therein declared suffered defeat at the hands of the electorate. Since that time somewhat similar legislation has been proposed and rejected. However, limited and less authoritative enactments have been passed.

In 1915, a Department of State Mining Bureau was created for the protection of natural resources of petroleum and gas from waste and destruction. It provided for the appointment of a State Oil and Gas Inspector and also prescribed his duties and powers. In 1929 (Stats. 1929, ch. 535, p. 923), this act was amended declaring the *unreasonable* waste of natural gas to be opposed to the public interest and unlawful. In

1939 (Stats. 1939, ch. 93, p. 1067), the Public Resources Code was adopted and the enactments then in force were incorporated therein. Sections 3300 et seq., provide generally that the *"unreasonable waste"* of natural gas, before or after the removal of gasoline from the gas, is opposed to public interest. Provision is made for *voluntary* agreements between the respective parties for the purpose of bringing about cooperative development and operation of oil fields as a unit, on approval of the supervisor, but there is no specific provision for *compulsory* repressuring of an oil or gas field as a unit.

In two large oil production states, Louisiana and Oklahoma, legislation has been enacted looking to compulsory unitization or recycling of gas in any oil pool, but provision is made for a hearing and notice, or 50 per cent of the operators of a field can petition for such unitization. A special corporation commission charged with the duty of administering the law is designated and special machinery for carrying it into effect is created by statute. Apparently some practical difficulty is arising in attempting to enforce such unit organization, even under such a statute. (See Jan., 1948, issue of Oil & Gas Journal, p. 46.) Respondent's brief indicates that a test case is now pending involving the constitutionality of the Oklahoma statute.

It should also be here noted that in Texas there are statutory provisions permitting operators to enter into a unit agreement for the operation of a gas field with the approval of the attorney general (Vernon's Civil Statutes, art. 6008, § 21), but with respect to oil, the statute prohibiting waste, including underground waste, restricts the definition of "waste." Article 6014(g) provides: ". . . however, it is not the intent of this act to *require* repressuring of an oil pool or that the separately owned properties in any pool be unitized under one management, control or ownership."

It therefore appears to us that the question whether public policy requires the retention of gas in the ground or its return to the ground after being brought to the surface in connection with oil production, or the cutting off of the supply to present users of natural gas from such production, and the wisdom of any such drastic course is a question that should be decided, not by the courts, but by the Legislature. (*People* v. *Pacific Health Corp.*, 12 Cal.2d 156 [82 P.2d 429, 119 A.L.R. 1284].)

A bill was heretofore presented to the Legislature (A. B. 700 [1947]) and rejected, and one is now pending (A. B.

2718) bearing on this subject. The Legislature has been careful to state and expressly provide the particular acts which it deems to be a waste of oil and gas, and has provided the necessary procedure for presenting such question to the director (Pub. Res. Code, § 3302), but where unitization or repressuring is referred to, it has expressly left such matters to agreement between the parties concerned, subject to the supervisor's approval. (Pub. Res. Code, § 3301.) The Legislature is fully cognizant of the question here presented, as evident from the history of the Atkinson Oil Control Bill. It may be that plaintiffs have presented a persuasive argument in favor of legislation looking toward some form of compulsory unit operation of a field such as the complaint describes, but no matter how good the argument for legislation may be, a court is not the body to whom such an argument should be addressed.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied July 1, 1949, and appellants' petition for a hearing by the Supreme Court was denied August 4, 1949.