**Carroll T. HEROD et al., Appellants,**

v.

**GRAPELAND JOINT ACCOUNT et al.,
Appellees.**

**No. 4103.**

Court of Civil Appeals of Texas.

Waco.

March 28, 1963.

Rehearing Denied April 18, 1963.

---

**2.** The Miller case is one of those cited under the statement in 37 T.J.2d above mentioned.

**624**

Thompson, Knight, Wright & Simmons, C. Douglass Forde, Jr., Dallas, Adams & Granberry, Crockett, for appellants.

Trueheart, McMillian & Russell, P. H. Swearingen, San Antonio, Reeves & McDonald, Palestine, LeVoy Musick, Houston, J. Burleson Smith, San Antonio, J. B. Sallas, Nat Patton, Crockett, for appellees.

WILSON, Justice.

Plaintiffs' action for recovery of a four-fifths undivided interest in oil, gas and other minerals in a 142 acre tract and seeking an accounting, asserted termination of a lease upon cessation of production. Defendants answered that the lease continued to be effective by unitization of the 142 acres with other leased lands. The court sustained appellees' motion to withdraw the case from the jury and render judgment

for them. The appeal requires construction of a contract consisting of an oil and gas lease, a division order agreement, and mineral deeds contemporaneously executed by spouses, Herod, Finch and Jones, in which Grapeland's assignor was grantee and lessee.

The lease, jointly executed by Herod, Finch and Jones in February, 1940, described 893 acres comprising the Herod 142 acres, the Herod-Finch 319 acres, Herod-Finch 137 acres and the Jones 295 acres in four separately owned tracts located in the Grapeland Gas Field area. It was for a 10-year primary term "and as long thereafter as oil, gas or other mineral is produced from said land hereunder." It obligated lessee to drill to test the Woodbine sand, and to drill a second well if minimum potential was not realized. It contained numerous other provisions not considered material or controlling, and these:

"11. In the event the acreage now or hereafter embraced within the terms of this unit lease is productive of gas, *withdrawal thereafter shall be effected fairly among the several unit leases owned and/or operated by Lessee* in the Grapeland area. In the event a commercial gas well is completed upon this lease, lessee agrees to process or cause to be processed, the gas production from said land thru what is known as a recycling plant the construction of which shall be commenced on or before thirty days after the completion of the said commercially productive well. *Lessee shall return the gas remaining after such processing to the formation within the Grapeland field from which it was produced either in well or wells on or off this lease* or in the Grapeland field."

The Unit Division Order Agreement recited Grapeland was constructing a recycling or repressuring plant in the Grapeland Field "to process gas produced from properties which have been unitized into

what is known as the Herod, Finch and Jones unit lease", describing the same four tracts. It authorized Grapeland "to connect with the well or wells now or hereafter located upon said premises, and to take, receive, process, and dispose of all gas produced therefrom during the continuance of the existing oil and gas leases embracing the lands above described", and stated, "for said purpose, we do hereby respectively *assign and convey said gas* to said Company, its successors and assigns".

The division order provided the unit lease should be credited for the account of the royalty interest of Herod, Finch and Jones when products were recovered, saved and marketed after monthly determination of condensate content by specified field tests; that accurate meters should be maintained at "the wells located on said premises to accurately measure said gas, and the Company shall *have the right to commingle* said gas and the products therefrom either in said plant or before the point of entry therein, *with other gas processed through such plant*," whereupon the condensate recovered *from all gas actually processed*, together with resulting residue gas, should be *"apportionately attributable* to *respective sources of production."* It provided unsold residue gas remaining from raw gas, after processing, should "be *returned to the producing formation in this unit lease or any other leases or lands in the Grapeland Field.* And if a well or wells in this Unit Lease be used for input purposes, Company may *return therein gas produced from any of said leases with which said plant may be connected*", and *"Should there be a market for residue gas, Company is authorized to sell the same at the plant* and if such sales are made by Company, said *unit lease shall be credited with its proportionate part* of the net proceeds from the sale of such residue gas".

The mineral deeds conveyed to Abell, Grapeland's grantor, an undivided 1/8th interest in oil, gas and other minerals in and under the described tracts, and provided such interest "shall *not for a period of ten years* from date hereof *be unitized or combined with minerals located on other land* or under separate oil and gas leases *without the written consent of each, except as provided in the joint lease"* contemporaneously executed by Herod, Finch and Jones.

We have attempted to quote or italicize the language emphasized by the parties as significant.

Grapeland drilled and completed a producing gas well, designated as its No. 1, on the Herod-Finch 137 acres in July, 1940. It completed its No. 2 producing gas well on the same land in June, 1941. No. 2 ceased production in 1945; No. 1 in 1951. There was no production from any land included in the Herod-Finch-Jones unit lease from January, 1951 until January, 1958, when well No. 5 was completed on the Jones tract. In October, 1958 Grapeland completed a continuously producing gas well, its No. 6, on the Herod 142 acres.

Grapeland held four other unit leases in the Grapeland Gas Field under recorded contracts containing provisions similar or identical to that under construction. This suit was originally filed against Grapeland, not as one to recover title to the 4/5ths interest and an accounting for production, but as an action for adjustment of royalty interests based on alleged wrongful inclusion of the Jones 140 acres in acreage proportions of the unitized lease. The form of action was changed after completion of Grapeland No. 6 to an action for cancellation of the lease, based on the contention it terminated in 1951 with cessation of production. The father made no complaint of unitization, and during his lifetime is alleged to have received over $16,000 in royalties known by him to come from wells from Grapeland's other unit leases over a period of nearly 20 years. The father had sued prior lessees of a portion of the Herod 142 acres for damages for failure to unitize, alleging that all his other leases were included in pools or units. These facts are the basis for Grapeland's claim of ratification and estoppel, which appellants meet

with a claim of homestead. Under our view of the case it is unnecessary to pass on these matters. Another point concerning evidence thereby becomes immaterial.

Appellants summarize the questions involved as being whether the unit lease, mineral deed and division order establish a term for the unit lease different from that stated in its habendum clause. They assert that the three instruments do not authorize unitization or pooling with other acreage; that lessee may not accomplish it by its unilateral conduct; and that when production on the Herod-Finch-Jones lease ceased, the lease terminated.

Grapeland's position is that, although there was no production on that unit lease from 1951 to 1958, the instruments authorize unitizing this lease with Grapeland's four other unit leases in the field which were also connected with its recycling plant, in so far as it relates to reinjected residue gas; that it was so unitized under the contract, and the term thereafter extended by continuous withdrawals of reinjected residue gas from other unit leases, during which the Herod-Finch-Jones unit lease was credited with its proportionate part of the proceeds. It says that since all five of its unit division order agreements conveyed and assigned to it all gas in place, and the instruments provided for return of residue gas to the reservoir through wells on any of the five unit leases—as it actually was returned for storage—the lease was continued in effect by continuous allocation to it of its proportion of proceeds from gas withdrawn from the common reservoir, regardless of the well from which it was withdrawn. It asserts further that as a tenant in common under its mineral deeds, and as licensee, Grapeland had the right and duty to withdraw reinjected residue gas and account for it as provided in the unit division order agreement, crediting each of the five unit leases with its portion of the proceeds. It asserts the division order was the "written consent" required by the mineral deed as a prerequisite to unitization, as to dry residue gas processed, reinjected and withdrawn.

The general nature of the cycling process is outlined by Pressler, 24 Tex.L.Rev. 19 (1945); Horner, 4 Baylor L.Rev. 300; McKeon, 4th Inst. Oil & Gas Law, S.W. Legal Found. (1953) 281, 284; Myers, Pooling and Unitization, (1957) Sec. 2.03, pp. 26, 38; and see generally Corzelius v. Harrell, 143 Tex. 509, 186 S.W.2d 961, 970; Tide Water Associated Oil Co. v. Stott, (5th Cir.) 159 F.2d 174, 176, cert. den. 331 U.S. 817, 67 S.Ct. 1306, 91 L.Ed. 1835; Art. 6008b (Acts 1949) Vernon's Ann.Tex. Stats.; Western Gulf Oil Co. v. Superior Oil Co., 92 Cal.App.2d 299, 206 P.2d 944. In 1940 cycling appears to have been a relatively novel procedure,[1] developed rapidly by the exigencies of the war and used where there was limited market, or none, for dry gas. The process is generally described as follows: After production from a gas stratum and extraction of heavier hydrocarbon content, residue gas is returned under pressure to the reservoir by injection through input wells for storage awaiting market demand. The expanding reinjected dry gas mechanically displaces wet gas toward producing wells properly located with relation to the input wells.

The covenant against unitization in the mineral deed is relied on by appellants as primarily controlling. This agreement, however, is qualified by the words, (a) "without the written consent of each" and (b) "except as provided in the joint lease" executed by Herod, Finch and Jones.

The latter instrument clearly recognizes Grapeland owns and operates "several unit leases" in the field, and obligates it to process gas production from the Herod-Finch-Jones unit through a cycling plant to be constructed. It requires Grapeland to return gas "remaining after such processing

---

1. It is said community leases, also, were first dealt with by Texas Courts in 1940 in Parker v. Parker, Tex.Civ.App., 144

S.W.2d 303, writ ref.—Hoffman, Voluntary Pooling and Unitization (1954) 12.

to the formation within the Grapeland Field from which it was produced"; but it does more; it contemplates returning such residue to the formation regardless of whether it was produced "in wells on or off this lease."

The Unit Division Order Agreement expressly recites contemplated construction of a cycling plant to process gas produced from the Herod-Finch-Jones lease lands, and authorizes Grapeland to connect with wells thereon and to process and dispose of the gas during continuance of the lease, assigning and conveying the gas to Grapeland. There is express authorization to commingle the residue with other gas in, or before entry to the plant. The proceeds are to be "apportionately attributable to the respective sources of production."

Grapeland is granted free use of all residue gas for plant operation. Unsold residue is directed to be returned to the formation in this "or any other leases or lands in the Grapeland Field." Grapeland is authorized to use Herod-Finch-Jones wells for input purposes, and to return therein "gas produced from any of the leases with which said plant may be connected."

The division order clearly provides for communal sale of all residue gas if a market exists, and requires that the Herod-Finch-Jones unit lease be "credited with its proportionate part of the net proceeds." It appears preparations for competitive cycling operations by other operators were then being made in other portions of the area.

It is obvious from the face of the agreement that the parties contemplated the cooperative processing, development, conservation and marketing of residue gas through the cycling process; the storage of it, pending a market, by commingling before or after injection with gas from other sources; the use of the reinjected residue to facilitate production of wet gas, and withdrawal of the commingled residue from all combined sources for sale. The entire contract necessarily contemplated possible early displacement of wet gas and loss of production from a particular well or area by virtue of the physical laws inherent in the recycling process agreed upon. It also anticipated, we think, that forced migration of unprocessed wet gas resulting from cycling, and reinjected residue gas, might eventually return a portion of that previously displaced or reinjected to a position in the reservoir under the Herod, or other tracts, where the drilling of new productive wells would be required to capture it.

Although appellants' position is persuasive, in our opinion the parties manifestly intended, and there was effected a unitization of the Herod-Finch-Jones unit lease with other Grapeland leases for these expressed purposes, and continued operation thereunder prevented termination of the lease for such purposes at the expiration of the primary term, or cessation of production on the unit lease lands. Southland Royalty Co. v. Humble Oil & Refining Co., 151 Tex. 324, 249 S.W.2d 914, 916; Veal v. Thomason, 138 Tex. 341, 159 S.W.2d 472, 475, 476; and see Lone Star Gas Co. v. Murchison, Tex.Civ.App., 353 S.W.2d 870, writ ref. n. r. e.; Horner, Secondary Recovery Methods, 4 Baylor L.Rev. (1952) 296; Hoffman, Voluntary Pooling and Unitization (1954) 231, 243; McRae, Granting Clauses, 9th Inst. Oil & Gas Law, Southwestern Legal Found., (1951) 42, 62; Hughes, Recycling, 10th id., (1958) 105, 116; Bounds, Division Orders, 5th id., (1954) 91, 113.

Other points are overruled.

Affirmed.