**PICKENS et al. v. RYAN CONSOL. PETROLEUM CORPORATION et al.**

No. 9774.

Court of Civil Appeals of Texas. Austin.

March 16, 1949.

Rehearing Denied April 6, 1949.

Prentice Wilson, of Dallas, Dan Moody, and J. B. Robertson, both of Austin, for appellants Pickens and Coffield and others.

Price Daniel, Atty. Gen. of Texas, Joe R. Greenhill and Elton M. Hyder, Jr., Asst. Attys. Gen., and James D. Smullen, former Asst. Atty Gen., of Houston, for Railroad Commission of Texas.

Zellner Eldridge, of Dallas, Goldsmith, Bagby & Furr, Raymond Furr, and Arthur Bagby, all of Austin, for Ryan Consol. Petroleum Corporation.

Rex G. Baker and Nelson Jones, both of Houston, Powell, Wirtz & Rauhut and J. A. Rauhut, all of Austin, for appellee Humble Oil & Refining Co.

ARCHER, Chief Justice.

This is a Rule 37 case on appeal from orders of the Railroad Commission granting a permit to appellants Pickens and Coffield to drill well No. 1 on their lots Nos. 10 and 11 in Block 23, Hawkins Townsite, Wood County, Texas, in the Hawkins Oil Field, and denying a permit to Ryan Consolidated Petroleum Corporation to drill a well on their adjacent lots 12 and 13. The Humble Oil Refining Company intervened as co-plaintiff with Ryan in attacking the Pickens permit, and with the Railroad Commission in defending the denial of the Ryan

application, and remaining neutral as to Ryan's alternative plea for equitable relief against Pickens and Coffield.

Ryan in its pleadings seeks a determination of its correlative rights as a subdivision lessee in and to oil and gas in place drawn from a common source, and on this its points are based generally.

On a trial before the court without a jury, judgment was rendered vacating and setting aside the permit granted appellants Pickens and Coffield, and enjoining production from the well that had been drilled under said permit. The Railroad Commission denied the application of Ryan for a permit to drill on its lots 12 and 13.

All of lots 10, 11 and 12 were acquired by H. C. Holmes prior to 1919; title to lot 13 was acquired by limitation and by a quitclaim deed. Subsequent to the death of H. C. Holmes and his wife, their heirs executed an oil and gas lease, under which, by assignment, Pickens and Coffield owned 7/8 of the leasehold estate in lots 10 and 11, effective as of October 18, 1940; and by later lease and assignment Ryan became and at the trial was the owner of 5/6 of the leasehold estate in lots 12 and 13; each of said lots was 30 feet in width and 113 feet in length.

The combined area as it existed in October 1940 was entitled to one well to prevent confiscation as an exception based on a finding by the Railroad Commission that the tract as it originally existed needs a well for such purpose. This was held by the trial court.

The order of the Commission finds reasonable support in the record both as to the need for a well and the location by substantial evidence.

The application filed by Pickens and Coffield on November 14, 1945, with the Railroad Commission, on the printed form for a permit, had written at the bottom the words: "There is attached to and made a part of this application a typewritten statement signed and sworn to by appellant's counsel. The present as well as the original oil and gas leasehold rights to lots 10 and 11, Block 23, and lots 12 and 13, Block 23, Hawkins Townsite, Wood County, are reflected by this written statement. The application involves and is intended to involve the oil and gas leasehold rights, permit rights and development rights, past, present and future in lots 10, 11, said Block 23, as well as lots 12 and 13, Block 23, and particularly as those existed and prior to October 18, 1940."

The notice sent out by the Railroad Commission of a hearing to be held on December 3, 1945, provided that the application involved the leasehold rights, permit rights and development rights, past, present and future, in lots 10 and 11, as well as lots 12 and 13, and particularly as existing on and prior to October 18, 1940. This permit was denied, rehearing was granted, notice issued, and hearing set; and it being called to the attention of the applicants, Pickens and Coffield, by the attorney for Humble that notices covered only lots 10 and 11, and did not mention lots 12 and 13, this hearing was postponed and notices issued by the Commission of a hearing on the application of June 12, 1946, which contained the following: "The application involves, and is intended to involve the oil and gas leasehold rights, permit rights, and development rights, past, present and future, in lots 10 and 11, Block 23, as well as lots 12 and 13, Block 23, and particularly as those rights existed on and prior to October 18, 1940."

At this hearing the Commission entered its order granting a permit to appellants to drill their well No. 1 at a place selected by them, and on a spot suggested by witness Hudnall as the best location considering the four lots as a whole. This location finds reasonable support by substantial evidence, and there was no substantial evidence that the location of the well was not as good as any other location on the four lots, if not the best. This location is substantially equidistant from each of the four nearest wells.

The trial court found that the location fixed by the Commission and three others were equally supported by substantial evidence.

The appellants introduced J. S. Hudnall as a geologist and petroleum engineer, who stated that he was familiar with the map that was introduced as Pickens and Coffield

Exhibit No. 1; that he had this map before him when he testified before the Railroad Commission in the hearing on June 12, 1946; that considering that lots 10, 11, 12 and 13 herein involved are only entitled to one well, it was his opinion that that well should be located in the center of the circle on that exhibit in order to prevent waste and protect the drilling pattern of the field. That this location is on lot 11 about 25 feet north of the south line and 5 feet west of the east line of said lot.

He stated that a well at that point is farthest removed from any producing well in the area and will recover the maximum amount of oil; that this location is 134 feet from General American Well No. 1 on lots 6 and 7; 134 feet from Humble Well No. 6; 134 feet from General American Well No. 1 on lot 15; and practically 134 feet from the fourth nearest well.

That a well located at the point selected by him will, in his judgment, result in more oil being produced from the well and from the entire field than if located at any other point on the four lots.

On cross-examination by Mr. Rauhut, Mr. Hudnall testified further: "A.* * * That uniformity of spacing is the thing that is desired in making any kind of spacing order and to the extent that you would get more uniformity of spacing by drilling at this location than at any other, this is the best location, even though you subscribe to the theory of a well to 20 acres being the efficient drainage area.

"Q. Now, I believe you said that this location will ultimately produce more oil— will have a longer life than some other location on the four lots? A. Yes, sir."

In Humble Oil & Refining Co. v. Lasseter, Tex.Civ.App. 120 S.W.2d 541, 542, involving a similar question, this Court, in an opinion by Judge McClendon, said: "Where, independently of the voluntary segregation, the larger tract, including the segregated tract, is entitled to an additional well in order to protect the vested rights of the owners of such larger tract to recover their fair share of the oil thereunder in place, the permit to drill on the segregated tract will be upheld. And this, although the application be made to drill only

upon the voluntarily segregated tract and only by the owners of that tract, and be contested by the owners of the remaining portion of the larger tract.'"

In Stanolind Oil & Gas Co. v. Midas Oil Co., Tex.Civ.App., 143 S.W.2d 138 (Error Ref.), this Court held in effect that a permit granted by the Commission on a small tract subdivided in derogation of Rule 37 can be sustained if it was granted by the Commission pursuant to consideration of the tract as it existed before subdivision, and if the evidence failed to show that, on this basis, it was improperly granted.

█ As held by this Court in Railroad Commission v. Miller, Tex.Civ.App., 165 S.W.2d 504, 506:

" * * * The proper location of the well was a matter within the exclusive jurisdiction of the Commission, under its delegated authority to administer the conservation laws of the State, untrammeled by any agreement, whether express or implied, by the owners of the 3 a. tract, or by the owners of adjacent leases, or by any or all of them.

* * * * * *

"The 3 a. tract, as a unit, is concededly entitled to one well to protect the vested rights of those in whom those rights inhere; the Commission has the potential jurisdiction to locate the well on the 3 a. tract to protect those rights; and can so locate it whenever that jurisdiction is properly invoked."

By their second assignment the appellants complain of the error of the court in holding that no permit could be granted by the Commission until the said four lots had been pooled for such production, and an application for the joint development of the four lots for the use and benefit of all owners had been made.

In its findings of fact and conclusions of law, the court, among others, filed conclusion No. 4, as follows: "Said four lots being capable of full development as a whole or entire tract for oil and gas purposes by one well, and being entitled to at least one well, but neither said lots Nos. 10 and 11, considered as a unit, nor said lots Nos. 12 and 13, considered as a unit, being capable of separate development in com-

pliance with the rules and regulations of the Railroad Commission applicable to said field, the owners of leases in said four lots should be relegated to the situation as it existed prior to the subdivision of said four-lot area into separate lease tracts, which was a joint right to drill for the benefit of the owners of the oil, gas and other minerals in and under all four lots and the owners thereof have not been and are not so relegated until their separate lease tracts have been reunited as they were prior to leasing, either by pooling or by application for the joint development of the four lots for the use and benefit of the owners of the said four lots, neither of which has been done. The Railroad Commission, therefore, either should have denied both applications or withheld action thereon until such had been done, and its failure so to do is arbitrary, capricious, improper and unjust in that the granting to one and denying to the other of the applicants a permit to drill constitutes an attempt by the Commission to decide and declare priority of rights when no priority of rights exists."

This conclusion we do not believe finds support in law or in fact.

Art. 6014, Subd. g, Vernon's Texas Civil Statutes, reads as follows: " * * * however, it is not the intent of this Act to require repressuring of an oil pool or that the separately owned properties in any pool be unitized under one management, control or ownership."

■ The Railroad Commission has the power and duty to adopt rules concerning the conservation of the mineral resources of the State, but cannot limit the right to convey or partition by the owner of his land as to surface or mineral estate; such owner or owners cannot as a result of such conveyance of mineral estate secure an advantage, and thereby secure permits for wells on such subdivision.

In the case of Dailey v. Railroad Commission, Tex.Civ.App., 133 S.W.2d 219, 222 (Error Ref.), the court said: "Appellees Harrison Oil Company and J. S. Abercrombie Company seek to justify the action of the Commission in denying the permit to drill the well in question upon the ground that they offered to pool appellants' prop-

erty with adjoining acreage, alleging that under such arrangement appellants would obtain all their oil, and in consequence their vested rights to the oil would be protected. If it be assumed that the conservation statutes authorize the Commission to require pooling of acreage and that such pooling is not inhibited by the fundamental laws of both the state and the nation, upon which question we do not pass, a complete answer to the pooling contention is that the spacing rule in question does not provide for the pooling of lands, but provides that the Commission will by exception protect the vested rights of the owner of small or irregular tracts of land by permitting closer drilling than the general spacing distances prescribed in the rule. The Commission cannot arbitrarily require any pooling of acreage where it has no rule or regulation prescribing and defining pooling. The pooling of lands would necessarily curtail the owners' free use and enjoyment of them, and would therefore necessarily require that pooling must be defined with such reasonable certainty as the subject-matter dealt with will admit of; and, when so defined, the pooling rule or regulation becomes the guide or criterion governing the Commission in passing upon any application to require pooling. Manifestly, the fundamental law of both the state and the nation would not permit the Commission to determine on the spot such far reaching limitation of the right or use of private property, but would require that such matters shall be controlled by due process of law and freedom of contract. And having promulgated the special spacing rule in question providing for an exception to protect private rights in the use of property, the Commission cannot refuse to apply that exception where, as in the instant case, the facts require its application."

■ Then, too, there was and is the necessity that all persons at interest must be parties to any suit affecting their rights. In Sharpe v. Landowners Oil Ass'n, 127 Tex. 147, 92 S.W.2d 435, 436, the Supreme Court said: "It is settled beyond all question in this state that in a suit to cancel a written instrument all persons whose rights, interests, or relations with or through the subject-matter of the suit will be af-

fected by the cancellation are necessary parties. Business Men's Oil Co. v. Priddy, Tex.Com.App., 250 S.W. 156; McKay v. Phillips, Tex.Civ.App., 220 S.W. 176; State National Bank v. Lancaster, Tex.Civ.App., 229 S.W. 883; Dial v. Martin, Tex.Civ. App., 8 S.W.2d 241. The absence of a necessary party in a suit for cancellation is fundamental and jurisdictional to such extent that it must be considered by this court. It being apparent from the face of the record in this case that Stubblefield and wife are necessary parties to the suit, the trial court was not authorized to enter any judgment, and this court cannot render any judgment except to reverse and remand the case. Barmore v. Darragh, Tex.Civ.App., 227 S.W. 522."

Then, to the same effect, in Belt v. Texas Company, Tex.Civ.App., 175 S.W.2d 622, 624 (Writ Ref.), the court said: "It is also a well-established rule, however, that in any kind of action or suit, in order that a valid judgment may be rendered, all necessary and essential parties must be before the court, and that those who are necessary parties are such persons as have or claim a direct interest in the object and subject matter of the suit and whose interest will necessarily be affected by any judgment that may be rendered. * * * Under our practice, it matters little whether the suit be an action in trespass to try title, and therefore an action at law, or a suit to cancel a deed or other instrument, and therefore a suit in equity, the rule of necessary parties is the same."

See also Tidewater Associated Oil Co. v. Stott, 5 Cir., 159 F.2d 174; Keegan v. Humble Oil & Refining Co., 5 Cir., 155 F.2d 971.

In Trapp v. Shell Oil Co., 145 Tex. 323, 198 S.W.2d 424, 437, the Supreme Court held that: "The duties of the Railroad Commission as given by law do not encompass the power or authority of deciding the ownership of the title to land. We think it follows that the appeal contemplated by Section 8 of Article 6049c does not include such power, even though the appeal is to a district court of Travis County which, in a proper case, has such jurisdiction. It is also necessary to consider that this land is situated in Gregg County, and the claimants of title thereto have the right to litigate the title in the county where the land is situated under our venue statutes. Moreover, the district court of Gregg County has not jurisdiction to hear and determine the appeal provided under Article 6049c."

■ The Railroad Commission does not have the power to force a pooling agreement upon unwilling owners of mineral estates, and the trial court in this case did not have the power or authority to force a pooling of the mineral estate.

The retained royalty under the lease of lots 10 and 11 was ⅛, and under the lease presently owned by Ryan the royalty is ⅙; and one royalty owner or a group of royalty owners would as their present interest appears be entitled to a larger proportion under the lease on lots 12 and 13 than are those similarly situated under the lease on lots 10 and 11.

We do not find it necessary under our disposition of this case to pass on the appellants' points 3 to 12.

The judgment of the trial court cancelling the permit to Pickens and Coffield and enjoining production from the well drilled under such permit is reversed and judgment is here rendered sustaining such permit and dissolving such injunction; the judgment of the trial court denying a permit to Ryan is affirmed.

This judgment is without prejudice to the assertion by Ryan or other interested parties of any right which they may have in or to the oil or gas produced or to be produced from the well drilled by Pickens and Coffield on the lots in suit.

Reversed and rendered in part; in part affirmed.