RYAN CONSOLIDATED PETROLEUM CORPORATION
v. W. L. PICKENS ET AL

No. A-4650. Decided November 23, 1955.
Rehearing overruled January 11, 1956.
(285 S.W. 2d Series 201)

222

*A. W. Walker, Jr., J. Lawson Goggans, Jr.,* of Dallas, and *Jones, Herring & Jones,* of Austin, for petitioner.

The Court of Civil Appeals erred in holding that where a .4 acre tract of land under the well-spacing law was entitled to and was granted one well to protect the oil thereunder from confiscation, it constituted as a matter of law, a single drilling and producing unit, and it was error to deny one of two equal subdivisions lessees of that unit a right to share in the proceeds from a well so drilled, after all drilling and operating expenses had been repaid out of production, where it appeared that such lessee had offered to joint with the other subdivision lessee in drilling the well and paying its proportionate part of the expenses. Marrs v. Railroad Comm. 142 Texas 293, 177 S.W. 2d 941; Gilmore v. Waples, 108 Texas, 167, 188 S.W. 1037; Warren v. Osborne, Texas Civ. App., 154 S.W. 2d 944, writ refused for want of merit.

*Prentice Wilson,* of Dallas, *Chilcote & Clark* and *Powell, McDonald & Mell,* all of Tyler, *W. W. Harris,* of Quitman, *M. H. Barton,* of Henderson, *Jones & Jones,* of Mineola, and *Moody & Robertson,* of Austin, for respondents.

MR. JUSTICE SMITH delivered the opinion of the Court.

The opinion rendered in this cause on the 23rd day of March, 1955 is withdrawn and the following opinion is substituted in lieu thereof.

This is a suit brought by Ryan Consolidated Petroleum Corporation, as plaintiff, for equitable relief from the confiscation of oil and gas by Pickens & Coffield, as defendants. The defendants won a take nothing judgment in the trial court which has been affirmed by the Court of Civil Appeals, 266 S.W. 2d 526.

Pickens & Coffield hold an oil and gas lease upon one half and Ryan Consolidated Petroleum Corporation holds an oil and gas lease upon the other half of a tract consisting of four lots in the Hawkins townsite. The four lots were subdivided after Rule 37 became applicable. Respondents, in addition to the interest acquired under their lease, own an undivided 1/6th mineral estate under Lots 10 and 11, and an undivided 1/6th mineral estate under Lots 12 and 13. This interest was purchased from Mack Holmes, one of the minors who signed the original lease dated November 9, 1940. Pickens & Coffield secured a permit and drilled a well upon their one half. The Railroad Com-

mission denied Ryan a permit to drill on its one half of the original tract, and Ryan now seeks in this suit an equitable share of the oil produced from the Pickens & Coffield well, based upon its proportionate ownership of the entire tract.

The permit was granted for the purpose of preventing confiscation and physical waste. On the question as to location of the well, Pickens & Coffield's expert witness testified that in order to best protect the drilling pattern of the field, to prevent waste, and from the viewpoint of maximum drainage efficiency and maximum production from the well throughout its future life, the well, in his opinion, should be located on Lot 11 (Pickens & Coffield lot). Ryan's geological expert, Mr. Griffin, testified that the best location for the well would be on Lot 13 owned by Ryan.

The four lots comprising one tract of .4 acre of land involved in this suit was situated in the township of Hawkins. Prior to the discovery of oil in what is now known as the Hawkins Field, the Holmes Heirs were the owners thereof. The tract is described as Lots 10, 11, 12 anl 13. Lot 13 was acquired by the Holmes Heirs under the ten-year statute of limitation of the State of Texas. On October 18, 1940, the adult Holmes Heirs leased to Smith and Morrison Lots 10, 11 and 12. On November 9, 1940, the minor Holmes Heirs leased their 1/3 interest in all four lots to Smith and Morrison. The leases to Smith and Morrison each provided that the lessor has "granted, demised, leased and let and by these presents does grant, demise, lease (and) elt unto said lessee, with the exclusive right to prospect, * * * operate, produce, store and remove therefrom oil, gas, casinghead gas, and all petroleum products * * * ;" and the leases further provided: "1. Lessee shall deliver to the credit of the lessor as royalty, free of cost, in the pipe line to which it may connect its wells the equal one-eighth (1/8) part of all oil produced and saved from the leased premises."

On December 13, 1940, Smith and Morrison released all of their interest in Lots 12 and 13. The release contains a ratification and confirmation of the leasehold estate held by Smith and Morrison on Lots 10 and 11. The instrument of release concludes with the following paragraphs:

"Now therefore, in consideration of the premises and for the purposes of consummating said settlement agreement, first parties have released and quit-claimed and do by these presents release and forever quit-claim unto second parties, their heirs

and assigns, all right, title, interest and claim in and to lots twelve and thirteen of Block twenty-three, town of Hawkins, Wood County, Texas, and all oil, gas and minerals in and under said lots and that may be produced therefrom, and, "Second parties have ratified and confirmed and do by these presents ratify and confirm unto first parties and their assigns the above mentioned oil, gas and mineral leases, executed by them and now shown of record in Wood County, Texas, and declare the same to be valid and binding in all their terms and conditions insofar as they cover and include Lots ten (10) and (11) of Block Twenty-three (23), town of Hawkins of Wood County, Texas, and no further; the intention being to correct and amend said oil, gas and mineral leases by excluding from their operation lots twelve (12) and thirteen (13) as fully as though they had originally covered lots ten (10) and eleven (11).

On December 26, 1940, Smith and Morrison assigned the lease covering Lots 10 and 11 to Coffield, who in turn assigned the lease, so far as Lot 11 was concerned, to Pickens. On the same day, December 26, 1940, the Holmes Heirs leased their interest in Lots 12 and 13 to petitioner, Ryan. The instrument of release and confirmation above referred to was duly approved by the Probate Court of Wood County, Texas. Thus, it is clear that the adult Holmes Heirs, after October 18, 1940, and the minor Holmes Heirs after November 9, 1940, had no interest in the oil rights in and under or to be produced from Lots 10 and 11, except the reserved 1/8th of the oil and the 1/6th interest which reverted to Mack Holmes on November 8, 1943, the date of the expiration of the primary term of the original lease executed by the Holmes minors. They conveyed a determinable fee to Smith and Morrison of 7/8th of the oil in and under Lots 10 and 11. The Holmes Heirs have never acquired by any subsequent conveyance or the instrument of release a greater interest in Lots 10 and 11 than that which they reserved in the original lease executed on October 18, 1940. Petitioner Ryan's lease only covered Lots 12 and 13. Petitioner acquired a determinable fee of 7/8th of oil to be produced from Lots 12 and 13 only. Ryan acquired no interest in Lots 10 and 11.

■ When Pickens & Coffield secured the leasehold rights in Lots 10 and 11 they were charged by law with notice of the fact that they could not drill a well thereon except to prevent waste, or by reason of the preference right as the first lessee of Lots 10 and 11 of the four lots involved, or by reason of a finding by the Railroad Commission that the best location for the one well to prevent confiscation was on one of their lots.

When Ryan secured 7/8th of the leasehold rights in Lots 12 and 13, it was charged with notice of the fact that the four lots might not be entitled to but one well to prevent confiscation. It was charged with notice that the Holmes Heirs had executed a lease on Lots 10 and 11 to Smith and Morrison (assigned to Pickens & Coffield) providing for the exclusive right to drill a well thereon and containing a general warranty of title, and further that if the Railroad Commission found that the one well, to which the four lots were entitled to prevent confiscation, should be drilled on Lots 10 and 11, no well could be drilled on Lot 12 or on Lot 13, *except to prevent waste*. The permit granted to Pickens & Coffield was to prevent confiscation and waste. At the time the Holmes Heirs executed leases covering Lots 10 and 11 to Smith and Morrison, and later executed leases to Ryan covering Lots 12 and 13, it was not known whether the Railroad Commission would decide that two wells were necessary to prevent waste.

■ Petitioner asserts the further contention that the application for permit filed by respondents "clearly involved all four lots * * * and that since respondents have utilized petitioner's two lots in securing the drilling permit for a well on the four lots, in sustaining such permit in the courts, and in securing an allowable for the well, respondents are judicially estopped to deny the right of petitioner to share in the production from such well." We cannot agree with this contention. The record shows that the permit granted to Pickens & Coffield was upon an application for request to drill a well of their own on Lots 10 and 11. The record shows that petitioner and the Railroad Commission were fully advised that the Pickens & Coffield application was not for a well on the four lots and the proceedings before the Commission and the courts show that Pickens & Coffield had consistently refused to make an agreement with petitioner pooling Lots 10 and 11 with Lots 12 and 13, but insisted *that the one well to which the four lots as they existed before subdivision* were entitled should properly be drilled on Lots 10 and 11. Petitioner was fully advised that Pickens & Coffield, in case the well was so drilled, would claim the right to all of the oil produced thereby. The application does contain the sentence: "The application involves and is intended to involve the oil and gas leasehold rights, permit rights and development rights, past, present and future in Lots 10, 11 said Block 23, as well as Lots 12 and 13, Block 23, and particularly, as those rights existed and prior to October 18, 1940." This sentence which petitioner contends constitutes judicial estoppel was inserted in the application in order to comply with the rule announced in the case

of Railroad Commission v. Miller, Texas Civ. App., 165 S.W. 2d 504, wherein it was held that the Railroad Commission could not grant a permit on a small segregated tract in derogation of Rule 37 except pursuant to an application for a permit on such small tract that invoked the jurisdiction of the Railroad Commission to consider the two subdivided tracts as they existed before division thereof and pursuant to notices issued by the Railroad Commission fully stating the character of the application.

Prior to the filing of the application involved respondents had filed applications with the Commission for a permit to drill a well on Lots 10 and 11 without mentioning Lots 12 and 13. These applications were refused because they were not in the form as required by the decision in Railroad Commission v. Miller, supra. In the order granting respondents a permit to drill a well on Lot 11, the Railroad Commission found that the application showed good cause, and that no injustice would be done by the granting of such exception to respondents, and that the permit should *be granted to prevent physical waste and confiscation of property.*

Petitioner does not claim title to Lots 10 and 11. Neither do Pickens & Coffield claim any rights acquired by Ryan under its lease from the Holmes Heirs covering Lots 12 and 13. Each party filed separate applications for permits to drill on their respective lots. The Railroad Commission understood and treated petitioner's application as involving only Lots 12 and 13, and likewise treated respondents' application as involving a request for a permit to drill a well on Lots 10 and 11, and that each application involved separate and distinct leases. After the granting of a permit to respondents to drill a well on their own Lot 11 under Rule 37, Case No. 41816-A, and the refusal of petitioner's application in Rule 37, Case No. 31814-A for a permit to drill a well of its own on Lots 12 and 13, petitioners filed a motion in respondents' case, and there sought to set aside the order granting respondents' permit. The Railroad Commission overruled petitioner's motion. The order overruling the motion refers to respondents' application as being one for a special permit to drill a well on Lots 10 and 11, Block 23, and not on Lots 10, 11, 12 and 13. When the Railroad Commission overruled petitioner's motion for rehearing on its permit case, it referred to petitioner's permit application as being a request for a permit to drill a well of its own on Lots 12 and 13 and not on Lots 10, 11, 12 and 13. So, what was the relationship between the parties, and what rules governed the Railroad Commission

in determining the issue before it? The release and confirmation above referred to cannot be held to operate as a conveyance to the Holmes Heirs or their assignee, Ryan, of any rights in Lots 10 and 11 for the reason that the Holmes Heirs did not have any interest except the reserved 1/8th royalty at the date of the release and confirmation. Since Smith and Morrison acquired their lease on October 18, 1940, and the release executed at a subsequent date did not affect their rights under the lease, it naturally follows that Smith and Morrison and their assigns would have had the right on and after October 18, 1940 to drill on Lots 10 and 11 all the wells the Railroad Commission would permit to prevent *waste,* and did, under well-established rules, have a preference right to drill the one well the four lots were entitled to before subdivision to prevent *confiscation, provided the Commisson, based on substantial evidence,* located such well on either Lot 10 or Lot 11. The well was located on Lot 11 (Pickens & Coffield), and was completed as a commercial producer of oil on September 13, 1946. Ryan's application for a permit to drill on Lots 12 and 13 was denied by the Railroad Commission, and the findings of the Railroad Commission, so far as the location of the well is concerned have been upheld by the district court and the Court of Civil Appeals. Ryan Consol. Petroleum Corp. v. Pickens, et al, 266 S.W. 2d 526.

■ Now, who is entitled to the oil? There is only one answer to this question. Pickens and Coffield are entitled to keep 7/8ths of the oil produced from said well, and the Holmes Heirs, or their assigns, were entitled to have delivered to them the 1/8th of all the oil produced from said wells, all in accordance with the express terms of the lease dated October 18, 1940, unaffected by the subsequent release to the Holmes Heirs of Lots 12 and 13. To hold otherwise would be contrary to the well settled law in Texas. In our case, the parties were relegated to such rights to drilling permits as existed prior to October 18, 1940, the date of the first subdivision of Lots 10, 11 and 12. Prior to that date Lots 10, 11, 12 and 13 were under one common ownership. The Railroad Commission considered the tract as it existed prior to October 18, 1940. The notice of hearing, as well as the notice on rehearing, contained the provision that the rights to be considered were those existing on or before October 18, 1940. Prior to the first subdivision neither Rule 37 nor the subdivision rule of May 29, 1934, had any application and the tract comprising the four lots was entitled to a well permit as a matter of law. Brown v. Hitchcock, Texas Civ. App., 235 S.W. 2d 478, wr. ref.; Nash v. Shell Petroleum Corp., Texas Civ. App. 120 S.W. 2d 522, er. dism.; Shell Petroleum Corp. v. Railroad Commission,

Tex. Civ. App., 116 S.W. 2d 439, er. dism. The effect of the voluntary subdivision rule on the right of the owner of land to produce the oil thereinunder is well stated in the case of Gulf Land Company v. Atlantic Refining Co., 134 Texas, 59, 131 S.W. 2d 73, 80. In that case this Court held that the Railroad Commission cannot grant a well permit on a tract subdivided in derogation of Rule 37 to prevent confiscation, but can grant a permit for a well on such tract to prevent waste. The Court further said:

"* * * It is the law that every owner or lessee of land is entitled to a fair chance to recover the oil and gas in or under his land, or their equivalents in kind. Any denial of such fair chance would be 'confiscation' within the meaning of Rule 37 and the Rule of May 29th. Empire Gas & Fuel Co. v. Railroad Commission, Tex. Civ. App., 94 S.W. 2d 1240, writ refused. The right to be protected against 'confiscation' under Commission oil and gas rules is not absolutely unconditional or unlimited. We will now discuss the condition or limitation which the Rule of May 29th has imposed or engrafted on the right to be protected against 'confiscation.'

"An examination of the order or Rule of May 29, 1934, hereinafter referred to as the Rule of May 29th, will show that subdivisions of land, as such, which have or hereafter may come into existence after Rule 37 became effective are not protected at all against confiscation. When Rule 37 and the Rule of May 29th are read together, it is evidence that exception permits may be issued to protect such tracts from waste; but such exception permits cannot be issued to protect such tracts, as such, from confiscation. In this regard, the Rule of May 29th states 'no subdivision of property made subsequent to the adoption of the original spacing rule will be considered in determining whether or not any property is being confiscated within the terms of such spacing rule, and no subdivision of property will be regarded in applying such spacing rule or in determining the matter of confiscation if such subdivision took place subsequent to the promulgation and adoption of the original spacing rule.' To our minds, language could not be made plainer, or more all inclusive. Railroad Commission v. Magnolia Petroleum Co., 130 Texas 484, 109 S.W. 2d 967, supra."

Petitioner knew that the Railroad Commission had the power to adopt the Rule of May 29, 1934 providing that a subdivision in derogation of Rule 37 would be disregarded in passing on applications for permits to drill wells to prevent confiscation.

The petitioner knew that the Railroad Commission did not have the power to cause a merger or unitization of the separately owned leasehold rights of respondents in Lots 10 and 11 with those of petitioner in Lots 12 and 13.

■ Petitioner's contention that this case is one for equitable relief should not be sustained for the further reason that its position is inconsistent with the law of capture, which is a well-settled rule of property in this jurisdiction. The rule of capture is simply this—that the owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though part of such oil or gas may have migrated from adjoining land. The Railroad Commission is without power from the Legislature or by decisions of this Court to do anything more than declare illegal the drilling of wells which are prohibited by Rule 37. The Railroad Commission cannot change the law of Texas. The Legislature of this State has heretofore conferred broad, extensive and exclusive regulatory powers upon the Railroad Commission of Texas in the regulation of the oil industry of this State, but the Comission has not been given the power to determine property rights as between litigans. The courts, whether sitting as court of law or equity, determine such matters in accordance with existing laws in Texas.

Petitioner insists that the Mississippi case, Hassie Hunt Trust v. Proctor, 60 So. 2d 551, is directly in point. An examination of that case, as well as the case of Griffith v. Gulf Refining Co., 215 Miss. 15, 60 So. 2d 518, convinces us that the situation in Mississippi is entirely different from that in Texas. The case of Merrill Engineering Co. v. Capital National Bank, 192 Miss. 378, 5 So. 2d 666, was decided by the Supreme Court of Mississippi on January 26, 1942. That case involved the same question as we have here, and the Court recognized the rule of capture. However, the case was decided prior to legislative enactments in the State of Mississippi which had the effect of limiting and circumscribing the rule of capture. When the Griffith and Hassie Hunt Trust cases were decided in 1942, the Legislature of that State had prior thereto enacted chapter 117 Laws of 1932, Code 1942, Sec. 6132, et seq. Under the holding in the Griffth supra, 215 Miss. 15, 25; 60 So. 2d 518, 520, paragraph (b), Section 6140, Code 1942, which made it "the duty of the State Oil and Gas Board to prorate and regulate the gas well production from each common source of supply 'for the protection of public and private interests, *and to adjust the correlative rights and opportunities of each owner of gas in a com-*

*mon source of supply to produce, use or sell such gas.' "* (Emphasis added).

As said in the Griffith case, supra: "The above statutes wert forerunners of Chapter 256, Laws of 1948, and amendments thereto, Code 1942, Sec. 6132-01, et seq. It will be seen that the same general idea permeates the declaration of public policy in Section 1 of said Chapter as follows:" 'to protect the public and private interests against the evils of waste in the production and utilization of oil and gas, by prohibiting waste as herein defined; to *safeguard, protect and enforce teh co-equal and correlative rights of owners in a common source or pool of oil and gas to the end that each such owner in a common pool or source of supply of oil and gas may obtain his just and equitable share of production therefrom; * * *.'* " (Emphasis added). Section 10, Chapter 256 of the Laws of 1948, contains paragraph (b), " 'The Board shall in all instances where a unit has been formed out of land or areas of more than one ownership, require the operator when so requested by an owner, to deliver to such owner or his assigns his proportionate share of the production from the well common to such drilling unit, provided, however, that such owner receiving same shall provide at his own expense proper receptacles for the receipt or storage, of such oil or distillate.' "

The Griffith case expressly says that the question involved must be viewed in the light of these statutes. Having reached such conclusion, the court said: "We must at once brush aside such cases as Japhet v. McRae, Tex. Com. App., 276 S.W. 669 and Bruce v. Ohio Oil Co., 10 Cir. 169 Fed. 2d 709, 713, which deal with common law principles of unrestricted capture." The Legislature of Texas has not seen fit to enact legislation which would authorize the Railroad Commission to adopt and promulgate rules which would have the effect of rendering ineffective the rule of capture recognized in all of the decisions in this state. As was said in the case of Gulf Land Co. v. Atlantic, supra, subdivided tracts as such are not protected at all against confiscation. Since the leases owned by Pickens & Coffield vested a determinable fee estate in the oil and gas under Lots 10 and 11, and since they had the exclusive right to drill a well thereon and to produce and take all the oil and gas that was produced as a result of proper drilling operations, and since the conservation statutes and the regulations of the Commission have not abolished the ownership of oil in place nor the right of capture, the respondents have teh vested right to produce, store and remove from said lots the well located on Lot 11, all the oil, gas,

casinghead gas and other petroleum products, and this without liability to the petitioner, Ryan, the owner of the leasehold rights under its lease covering Lots 12 and 13. The rule applicable to the case at bar is well stated in 31-A Tex. Jur.., Sec. 5, pp. 24-27, as follows:

"\* \* \* In some states, the law looks to the fugaciousness of oil and gas in place and considers that they belong to no one until captured and confined. But this theory does not find approval in Texas. Here oil and gas in place are by the established rules of property a part of the realty or corpus of the land, and subject to ownership, severance, conveyance, lease and taxation as such. Being interests in land they are not subject to parol sale, but have the protection of the statute of frauds, the statutes regulating conveyances and mortgages of real estate, and the statutes requiring the recording of instruments affecting title to or liens on land. They are realty within statutes relating to venue. When oil or gas is removed from the soil it becomes personalty. The conservation statutes and the regulations of the Commission made thereunder have not abolished the ownership of oil in place nor the right of capture without liability to adjoining owners."

The courts of Texas have consistently held that the rule of capture is still in force in this State. It has become a vested property right. As said in the case of Brown v. Humble, 126 Texas 296, 83 S.W. 2d 935, 87 S.W. 2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393. "Owing to the peculiar characteristics of oil and gas, the foregoing rule of ownership of oil and gas in place should be considered in connection with the law of capture. This rule gives the right to produce all of the oil and gas that will flow out of the well on one's land; and this is a property right." In the case of Japhet v. McRae, Tex. Com. App., 276 S.W. 669, Japhet made the following contention:

" 'Where the lessor of land for oil and gas, subsequently to the execution of the lease, but prior to the development of the land and the production of oil or gas under the lease, sells a portion or portions of the land to others, and oil and gas are thereafter produced under the lease from some portion of the leased premises, the royalties therefrom belong to the owner of the particular tract upon which the well is located, and the owner or owners of other portions of the leased premises have no interest therein.' "

In affirming the trial court's judgment which upheld such contention, the Court said, in part:

"* * * As our Supreme Court has held, oil is fugitive in its nature, and ordinarily should belong to him who captures it and brings it to the surface. The quest for it involves tremendous expense and a vast element of chance. In spite of the scientific knowledge of the geologists, the industry still partakes largely of a gamble. It seems to us that the only safe rule, and the only one free from much confusion, is the one which gives the oil to the man who owns the land upon which the well is located. * * *"

Petitioner also contends in its application that "since respondents' application to the Commission clearly involved all four lots and at such time respondents owned an unleased 1/6th mineral fee in all four lots, being a co-tenant with petitioner as to Lots 12 and 13, respondents cannot secure a permit to drill on the four-lot unit and drill the well pursuant to such permit without accounting to its co-tenant, petitioner, for any part of the oil produced from such four-lot unit." Here, again, petitioner proceeds on an erroneous assumption that respondents' application for a permit involved all four lots. In answer to this contention the respondents present two counter points as follows:

## "COUNTERPOINT TEN

"The Holmes heirs segregated the mineral estate in Lots 10 and 11 from that in Lots 12 and 13 by separate leases to different parties and by conveying interests in royalties and in the oil payment to different parties; all owners of interests in Lots 10 and 11 and all owners of interests in Lots 12 and 13 have not joined in any transaction that would nullify this segregation; the 1/6th fee interest of Respondents in Lots 10 and 11 has not merged with the similar interest in Lots 12 and 13 and Respondents were not tenants in common with Petitioner.

## "COUNTERPOINT ELEVEN

"Even if Pickens and Coffield had been cotenants of Petitioner as owners of a 1/6th mineral fee interest in Lots 10 and 11 and of a similar interest in Lots 12 and 13 so as to burden their development of Lots 10 and 11 as claimed by Petitioner, they could not as such owners drill a well on Lot 12 or Lot 13 if the leases to Ryan on Lots 12 and 13 were still effective because in such case the only right Pickens and Coffield would have had in relation to Lots 12 and 13 under such mineral interest would have been to affirm the lease to Ryan and afterward claim a royalty under such lease or to elect to pay 1/6th of the cost of

drilling and operating any well drilled on Lots 12 and 13 and to take 1/6th of the oil produced therefrom. If the lease to Petitioner was not still effective it had lost any right it ever had."

■ The position of respondents is sound. The mineral rights in Lots 10 and 11 were segregated from those in Lots 12 and 13 when the Holmes Heirs forced the surrender by Smith and Morrison of their leasehold rights in Lots 12 and 13. The Holmes Heirs later leased Lots 12 and 13 to petitioner. The mineral lease to petitioner gave it the exclusive right to drill for oil on Lots 12 and 13. Petitioner was never a tenant in common with respondents in the fee interest or in the leasehold estate in Lots 10 and 11. See 11 Tex. Jur. 410. The fee interest owned by respondents in Lots 12 and 13 and the separate fee interest in Lots 10 and 11 did not merge into one. See 31 C. J. S. 141; Humphreys-Mexia Co. v. Gammon, 113 Texas 247, 254 S.W. 296, 29 A.L.R. 607; 17 Tex. Jur. 122, 123.

The theory of co-tenancy advanced by petitioner cannot prevail for another reason. Respondents acquired the above mentioned undivided 1/6th mineral estate under Lots 10 and 11, and a separate undivided mineral estate under Lots 12 and 13, after petitioner obtained its lease from the Holmes Heirs. The lease granted to petitioner the exclusive right to explore Lots 12 and 13 for production of oil and to produce oil therefrom. So long as this lease remained effective, respondents' mineral estate would be subordinate to the exclusive rights of petitioner under the lease. Under such circumstances the respondents could either ratify the lease or take 1/6th of the oil and gas less 1/6th of the expenses. See 31 Tex. Jur. 657, Sec. 81; Texas & Pacific Coal & Oil Co. v. Kirtley, Tex. Civ. App., 288 S.W. 619, wr. ref.

Respondents' motion for rehearing is granted and the judgments of the trial court and the Court of Civil Appeals are affirmed.

Opinion delivered November 23, 1955.

MR. JUSTICE WILSON, joined by CHIEF JUSTICE HICKMAN and JUSTICE GARWOOD, dissenting.

I respectfully dissent. The majority opinion permits the confiscation by Pickens & Coffield of minerals belonging to Ryan. In doing so, the constitutionality of Rule 37 is put in question

in that Ryan is deprived of its property without due process of law.

The majority opinion, based primarily on the rule of capture, makes only a partial statement of the rule of capture as I understand it, saying: "The rule of capture is simply this — that the owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though part of such or or gas may have migrated from adjoining land." Why is this much of the rule so? Because the owner of the adjoining tract from which the oil is migrating can protect himself by drilling offset wells. This equal right to drill has always supported the constitutionality of the rule of capture. Take it away and the reason for the rule fails, leaving a result not only unjust but one inconsistent with the fundamental concept of ownership of oil and gas in place as a part of the realty. Drainage of adjoining property under the law of capture was rationalized with ownership in place in Stephens County v. Mid-Kansas Oil & Gas Co., 113 Texas 160, 254 S.W. 290, 29 A.L.R. 566, on the basis of equal rights to drill. Under our law no one has a right simply to capture the property of someone else. But because of early difficulty in determining the source of oil produced from a well we stopped judicial inquiry at the mouth of the well, called it the rule of capture, and said that adjoining landowners could protect themselves by going and doing likewise. Admittedly this was a matter of expediency, and in the then state of the oil business and the then knowledge of reservoir dynamics, it reached a practical result.

This impulse to stop judicial inquiry at the mouth of the well springs from a judicial conviction that the subterranean movement of liquids is too "occult and secret" to be the proper subject matter of proof. See, for instance, a parallel conviction underlying the majority opinion in the recent water case of City of Corpus Christi v. City of Pleasanton, 154 Texas 289, 276 S.W. 2d 798. There was more justification for this feeling fifty years ago than there is now. I went to the trouble of writing a dissent in that case as I do in this case because of my belief that the principles of geology and reservoir dynamics will eventually win the same acceptance in judicial thought that they are accorded in business and financial thinking.

Now apply in a controlled reservoir this rule of capture to a small area of ground which under Rule 37 is a one-well unit. The whole basis of a compulsory well-spacing rule is that the well allocated to a given space will eventually produce all of

the recoverabe oil under that space. The constitutional basis for so policing the development of real property lies in the State's power to conserve and prevent the waste of its natural resources even though owned as private property. But because oil and gas in place is realty and is private property, not one square foot can be confiscated without payment of compensation. A basic spirit of fairness and a desire for objectivity makes the law, in the figurative language of the old writers, "frown" on exceptions to general rules, but we do have a recognized exception to Rule 37 made necessary by the Texas concept of the ownership of oil and gas in place as a part of the fee simple. That is this: A well permit will be allocated as a matter of law to an area smaller than the minimum under the spacing pattern for the particular field in order to prevent the confiscation of the oil and gas in place. But, obviously, if no time limit were placed on the origin of the small tract, a landowner strategically located on the top of a structure could gain an unfair advantage by selling off small tracts. So no drilling permit will be issued to a small tract as an exception to the spacing rule to prevent confiscation if the subdivision be created after the discovery of oil and gas. So we must start with the proposition that the well permit granted to prevent confiscation of the oil under Lots 10, 11, 12, and 13 will produce all the recoverable oil under those lots. If this be not so then the Railroad Commission has made an error in the spacing pattern for the field. As a matter fact, the "exception" wells on small tracts usually producer far more than their fair share. The constitutional basis for the granting of this exception well permit in the first place—preventing the confiscation of the oil under Lots 10, 11, 12, and 13 —partially fails if Ryan, as the true owner of the oil under Lots 12 and 13, has that oil confiscated by Pickens & Coffield.

By all the rules of estoppel Pickens & Coffield should not be allowed to deny that the well permit was granted for the purpose of preventing confiscation of the oil under Lots, 10, 11, 12, and 13 and is actually producing from all four lots. In any event, and with or without estoppel, the history of the permit proceedings before the Railroad Commission should establish this as a matter of law. Coffield first applied for a permit to drill lot 10 and Pickens separately applied for a permit to drill lot 11. Both were denied February 28, 1941. Next Ryan applied for a permit to drill one well on lots 12 and 13 and on April 7, 1941 this also was denied. Pickens again applied for a permit to drill lot 11 and this was again denied on August 22, 1941.

On November 14, 1945 Pickens & Coffield filed an application

to drill one well on lots 10 and 11. The notice for this application stated:

"The application involves, and is intended to involve the oil and gas leasehold rights, permit rights, and development rights, past, present and future, in Lots 10 and 11, Block 23, as well as Lots 12 and 13, Block 23, and partciularly as those rights existed on and prior to October 18, 1940."

On November 16, 1945 Ryan applied for a permit to drill a well on lots 12 and 13. The notice contained the following paragraph:

"The application involves, and is intended to involve the oil and gas leasehold rights, permit rights, and development rights, past, present and future, in Lots 12 and 13, Block 23, as well as Lots 10 and 11, Block 23, Hawkins townsite."

On December 21, 1945 both applications were denied. On February 26, 1946 rehearings were granted on both applications. A consolidated rehearing was held on March 12, 1946. On April 3, 1946 the Commission granted the Pickens & Coffield application in the following language:

"NOW, THEREFORE, IT IS ORDERED that the application of Pickens & Coffield, together with the application of Ryan Consolidated Petroleum Corporation for a permit to drill one well only on the four lots, Nos. 10, 11, 12 and 13, Block 23, said lots being owned jointly as follows: Nos. 10 and 11, by Pickens and Coffield, and Nos. 12 and 13 by Ryan Consolidated Petroleum Corporation, and the well being requested as well No. 1, Heirs of H. C. Holmes, et ux, Lots 10, 11, 12 and 13, Block 23, Hawkins townsite, Wood County, Texas, as shown by plat submitted, is hereby approved and since these four lots were originally one tract, it is the intention of the Commission to grant one well on the four lots and let both applicants share equally in the benefits of the one well the location of same being as follows:

"In the exact center of Lots 10, 11, 12 and 13, Block 23, Hawkins Townsite, and being midway between the north and south lines of said tract of four lots, and on the line between Lots 11 and 12."

On the same day the Ryan application was denied "in as much as applicant's interest is being taken care of in the well being granted on the four lots 10, 11, 12 and 13 and being located half

on the Ryan Consolidated property and half on the Pickens and Coffield property, it being the intention of the Commission to grant only one well on these four lots and have the two applicants share equally in this one well, * * *."

Subsequently, rehearings were granted by the Commission on both applications. The notice of rehearing on the Pickens & Coffield application contained at their request the following paragraph:

"The application involves, and is intended to involve the oil and gas leasehold rights, and development rights, past present and future, in Lots 10 and 11, Block 23, as well as Lots 12 and 13, Block 23, and particularly as those rights existed on and prior to October 18, 1940."

On July 3, 1946 the Commission granted Pickens & Coffield application for "a permit to drill well No. 1, Heirs of H. C. Holmes et ux., Lots 10, 11, 12 & 13." This is the permit under which the well was drilled. On July 5, 1946 the Commission denied the Ryan application. On August 7, 1946 Pickens & Coffield mutually conveyed to each other so that thereafter they each owned a one half (1/2) interest in a lease of five sixths (5/6) of lots 10 and 11.

On November 21, 1946 Ryan perfected an appeal to the District Court of Travis County by filing a Rule 37 suit attacking the Pickens & Coffield permit and the Commission's action in refusing their own application. The trial court judgment in that Rule 37 case denied both permits. In his conclusion No. 4 the trial court said:

"Said four lots being capable of full development as a whole or entire tract for oil and gas purposes by one well, and being entitled to at least one well, but neither said Lots Nos. 10 and 11, considered as a unit, nor said Lots Nos. 12 and 13, considered as a unit being capable of separate development in compliance with the rules and regulations of the Railroad Commission applicable to said field, the owners of leases in said four lots should be relegated to the situation as it existed prior to the subdivision of said four-lot area into separate lease tracts, which was a joint right to drill for the benefit of the owners of the oil, gas and other minerals in and under all four lots and the owners thereof have not been and are not so relegated until their separate lease tracts have been reunited as they were prior to leasing, either by pooling or by application for the joint develop-

ment of the four lots for the use and benefit of the owners of the said four lots, neither of which has been done. The Railroad Commission, therefore, either should have denied both applications or withheld action thereon until such had been done, and its failure to do so is arbitrary, capricious, improper and unjust in that the granting to one and denying to the other of the applicants a permit to drill constitutes an attempt by the Commission to decide and declare priority of rights when no priority of rights exists."

Both appealed. The Court of Civil Appeals reversed the trial court and rendered judgment affirming the Commission in granting the Pickens & Coffield permit and in denying the Ryan permit. 219 S.W. 2d 150.

It seems to me sheer blindness to hold that this record does not establish as a matter of law that the well was granted to prevent confiscation of the oil under Lots 10, 11, 12, and 13. But in the face of this the majority allows the confiscation of the oil under Lots 12 and 13—that is, if you define confiscation as the taking of property from the true owner without the payment of compensation. And can the majority deny the oil under Lots 12 and 13 belongs to Ryan? Not at all. Can the majority deny that its holding allows Ryan's oil under Lots 12 and 13 to be produced by Pickens & Coffield without payment to Ryan? It cannot and does not deny this, but in consolation cite Ryan to one half of the law of capture, saying in effect, "You cannot get a permit to drill on Lots 12 and 13, but if you could, you would protect yourself against drainage by drilling an offset well."

The difficulties of the majority with the law of capture are illustrated by its quotations from authorities holding that in Texas law oil is not fugacious but is fugitive—certainly an empty play on words. The majority quotes 31-A Tex. Jur., 5, pp. 24-27, as follows:

" '* * * In some states, the law looks to the fugaciousness of oil and gas in place and considers that they belong to no one until captured and confined. But this theory does not find approval in Texas. Here oil and gas in place are by the established rules of property a part of the realty or- corpus of the land, and subject to ownership, severance, conveyance, lease and taxation as such. * * *' "

It follows this by a quotation from Japhet v. McRae, Tex. Com. App., 276 S.W. 669, as follows:

" '* * * As our Supreme Court has held, oil is fugitive in its nature, and ordinarily should belong to him who captures it and brings it to the surface. * * *' "

But whether you call oil fugacious or fugitive is immaterial, and apart from the specific holdings giving them legal content, words do not mean much anyway. The important thing is to keep enforced well spacing as an operating principle in the development of oil fields. To do this the courts must preserve its constitutionality by carefully prescribing its limits and its effect. This decision will help break down Rule 37 and make its enforcement more difficult.

Suppose the Commission had refused to grant either side a permit and each had come into court and established that the entire tract of four lots was entitled to one well to prevent confiscation from all four lots. What could the courts do?

Pickens & Coffield claim that they cannot be forced to pool their lease with Ryan. Ryan claims that this contention puts the proposition exactly backwards. The true situation, according to Ryan, is that Rule 37 prevents the subdivision of a tract for oil and gas production purposes, and, rather than this being a forced pooling situation, Rule 37 prevents separate tracts from coming into existence, leaving the tract entire for oil and gas production purposes. Under this contention the minerals are frozen as one tract for drilling purposes as of the time Rule 37 attaches, but the parties are free to convey subdivisions as they will.

Pickens & Coffield contend that if the tract of land be treated as a unit for production of oil and gas and be entitled to the one well only, the owner of the particular spot upon which the well is located has the right to the entire production from the whole unsubdivided tract. The location of the well is to be determined by the Railroad Commission without regard to ownership and at a point which will result in the most production and the least waste with due regard to the systematic development of the field. In their brief they state:

"The net effect of Railroad Commission v. Miller, 165 S.W. 2d 504, is that the result of such a subdivision is that neither subdivided parcel as such is protected against confiscation; that the Commission can locate the well that was theretofore justified on the tract as it existed before subdivision at the *best point thereon;* and that the owner of the leasehold estate in the sub-

division on which the well is granted will get all the oil and the owner of the other subdivision none."

Ryan replies that as between the individual owners of the subdivision of the tract, this makes the well location a matter of pure chance which no one can foresee. Ryan points out that under this theory had the best location been determined to be twenty five feet east of where it is, the situation of the parties to this suit would have been completely reversed, and "The Railroad Commission has no power to take property from one person and give it to another by the mere location of a well site."

In actual operation the majority opinion will put an intolerable burden on the Railroad Commission. Obviously we should not in this situation require the Railroad Commission to choose arbitrarily between rival applicants and determine which owner can produce for the entire tract as a matter of grace or favor. Such a legal result should be utterly foreign to our form of government, but here, under the majority opinion the movement of the well location a few feet would have transferred the enjoyment of all the oil under all four lots. For most of the typical geologic structures, scientific data do not afford the Railroad Commission a basis for choice between two locations only a few feet apart. The effect of the majority opinion is to put the Railroad Commission in an unenviable position as possibly the subject of an influence battle.

Suppose the Railroad Commission should find that there is no scientific or factual basis for choosing between the rival applicants? But even if there be a scientific basis for moving the well location a few feet one way or the other, doesn't this make very valuable property rights hinge absolutely on the judgment of an expert?

It being established that, first, the well is allocated to and is in fact producing from a tract consisting of all four lots; that, second, Pickens & Coffield own a lease upon only one half (1/2) of that tract plus a one sixth (1/6th) mineral interest in the whole tract; and that, third, Ryan cannot under Rule 37 obtain a drilling permit for a well by which to produce the minerals under its lease upon the other one half, it becomes apparent that Pickens & Coffield should be required in equity to account for the oil and gas they are producing which they do not own and which is the property of Ryan. Otherwise the mineral rights under Lots 12 and 13 are in fact just what Pickens & Coffield say Ryan bought — a dead horse. This dead horse contention

is simply another way of saying that Rule 37 invalidates conveyances made after it attaches, a legal proposition which both parties agree to be wrong. Magnolia Petroleum Co. v. Railroad Commission, 141 Texas 96, 170 S.W. 2d 189; Nash v. Shell Petroleum Co., Texas Civ. App., 120 S.W. 2d 522, er. dism. Pickens & Coffield made it clear throughout their brief that in their opinion a subdivision contrary to Rule 37 is valid and binding as between the parties. They seek to take all real meaning out of it, however by denying to both halves of the subdivision the right to participate in the oil after it is produced. The well was applied for and granted by the Railroad Commission for the express purpose of preventing the confiscation of the minerals under all four lots. Can Pickens and Coffield obtain a permit to prevent confiscation of the minerals under lots 12 and 13 and then refuse to account to the owner of those minerals? Of what value would it be to Ryan as the owner of the minerals under lots 12 and 13 to be protected against confiscation generally only to lose them to Pickens & Coffield? On what theory can Pickens & Coffield drill a well to protect lots 12 and 13 against confiscation if it is not for the benefit of the owner of those minerals?

In the case at bar, Pickens & Coffield conveyed by release a part of the minerals, and this was valid. Why is it not a just result for the law to require them and others so conveying to honor their conveyance?

The apparently simple solution adopted by the majority is too simple, is contrary to the theory of ownership in place, and is an actual adoption of the fugacious theory of other states. It will work a very unfair and harsh result, will put the Railroad Commission to arbitrary decisions, will operate to confiscate the oil of Ryan without payment, and will give that oil to Pickens & Coffield in derogation of their conveyance of that very oil. I would remand for an equitable accounting.

Opinion delivered November 23, 1955.