**RAILROAD COMMISSION of Texas,
Appellant,**

v.

**C. F. DEBARDELEBEN, Jr., Appellee.**

No. 10439.

Court of Civil Appeals of Texas.

Austin.

Dec. 19, 1956.

Rehearing Denied Jan. 9, 1957.

John Ben Shepperd, Atty. Gen., Gordon Thrall, Lonny Zwiener, Asst. Attys. Gen., for appellant.

Small, Small & Craig, Austin, for appellee.

HUGHES, Justice.

This suit was by appellee C. F. DeBardeleben, Jr., against the Railroad Commission of Texas and its members in their official capacities in which he attacked an order of the Commission denying him exceptions to the Bethany Field density order for four additional gas wells one each on four 640 acre unitized tracts in such field.

The four wells had theretofore been drilled under permits issued by the Commission under circumstances to be stated.

On appeal from such order the Trial Court held appellee to be entitled to such wells to prevent confiscation and enjoined the Commission from interfering with the otherwise lawful operation of and production from such wells.

■ The Commission's first point is that appellee should have been denied injunctive relief because he was a law violator and did not come into court with clean hands.

We do not believe this point has substance for the reason that this is not a suit for purely injunctive relief, such relief being merely incidental to the principal relief sought. Furthermore, we doubt the necessity, not the propriety, of permanently enjoining the Commission from interference with a final judgment of a court of competent jurisdiction.[1] The Court's judgment decreeing appellee to be entitled to the wells in question would be just as effective without as with the restraining features of the judgment.

In 30 C.J.S., Equity, § 98, p. 490, it is said: "The clean hands doctrine has been held inapplicable to a suit at law, or a statutory proceeding, as distinguished from a suit in equity," citing Birk v. Jackson, Tex. Civ.App. Eastland, 75 S.W.2d 918, writ dismissed.

Directly in point is the opinion of this Court in Board of Insurance Commissioners v. Texas Emp. Ins. Ass'n, Tex.Civ.App., 189 S.W.2d 47, 53, affirmed 144 Tex. 543, 192 S.W.2d 149, where the validity of an order of the Board was in question, the Court saying:

"The fact that the relief sought was by injunction does not in itself necessarily determine the character of the action. Primarily the purpose of this suit was to test the validity of the order attacked, and the right to an injunction was dependent upon, and ancillary to, that main purpose. Consequently the unclean hands doctrine applicable to strictly equitable proceedings, does not here apply."

We will, however, for the sake of completeness as briefly as possible state the facts upon which the Commission sought to invoke the equitable doctrine discussed above.

Prior to December 1, 1955, there were, according to the designation of the Commission, the Bethany and Elysian Gas fields near the county line between Harrison and Panola counties, the Bethany field being in Harrison and the Elysian field being in Panola.

The Commission's rules for the Bethany field provided for a 640 acre proration unit with a tolerance of 10% and an allocation formula based ⅔rds on acreage and ⅓rd for well.

The Commission's rule for the Lower Pettit Zone of the Elysian field provided for a 320 acre proration unit with a 10% tolerance and an allocation formula based on 100% acreage times bottom hole pressure.

The Commission had also promulgated a Statewide Density Order which provided, in part, in substance, that: (1) That no well shall be drilled on less acreage than that required for a standard proration unit as established in the applicable rules for any oil or gas field in the State of Texas; (2) that a Form I (notice of intention to drill or deepen) shall be accompanied by a certified basic lease or unitized tract plat showing thereon the acreage dedicated to the proration unit for the proposed well and also showing thereon the acreage previously dedicated to all Commission-approved well locations on said basic lease or unitized tract, and further, that a permit to drill any well for oil or gas will not be granted until such plat has been attached

---

1. Temporary injunctive relief requiring bond, etc., is an entirely different matter.

to and made a part of such Form I; and (3) that after a unitized tract, wherein two or more separate tracts are joined for oil and gas development purposes, has been accepted by the Commission, it may not thereafter be subdivided into its original separate tracts unless and until approval for such subdivision is granted by the Commission after notice and hearing.

In 1954 and 1955 appellee made four applications for permits to drill gas wells in the northern portion of the Bethany field near the Elysian field, at about where the county line of Harrison and Panola counties join. Application was made to drill on the Roberts lease in the Bethany field on 232.50 acres on August 24, 1954, which lease was consolidated and unitized into the Roberts Unit of 649.84 acres, February 18, 1955. Application was made to drill on the Timmons No. 1 in the Bethany field on 370 acres on October 25, 1954, and this lease was subsequently consolidated and unitized into Timmons Unit No. 1 on 640.55 acres on February 18, 1955. Application was made to drill on the Timmons No. 2 in the Bethany field on 648 acres on March 5, 1955, and this was subsequently consolidated and unitized into Timmons Unit No. 2 on 649.13 acres on April 20, 1955. Application was made to drill on the Timmons No. 3 in the Bethany field on 640 acres on March 28, 1955 and this was subsequently consolidated and unitized as a 598.66 acre tract known as Timmons Unit No. 3 on April 20, 1955.

The Commission granted appellee authority to drill these four wells, and they were drilled and completed and are not questioned here.

In July 1955 appellee applied to the Commission for permits to drill four additional wells, one each on the four tracts previously described and on each of which he then had one well. These applications stated the tracts to be in the Elysian field and failed to disclose that such tracts had already been dedicated to proration units set up under the Bethany field rules.

These permits were granted August 1, 1955, the wells were drilled and brought in as producers. When appellee applied to the Commission for allowables for these new wells the Commission refused to grant any allowables for them having by then been alerted to the facts above noted.

Subsequently the Commission refused to approve these wells as exceptions to the Density and Bethany field rules. This refusal was based on appellee's "wrongful manner" in applying for the well permits and "because he showed neither waste nor confiscation." It is from this order of refusal that appeal to the court was made.[2]

On December 1, 1955, the Commission having determined that the Bethany and Elysian fields were a common reservoir combined them under the name "Bethany Field" and adopted the Bethany field rules, noted above, for the combined field.

█ It is clear that appellee violated the Commission's rules in failing to advise it when applying for permits for the last four wells that the acreage upon which the wells were to be drilled had been allocated to his four other wells. We do not condone this infraction of the rules. On the other hand we know of no rule or statute which authorizes us to mete out the punishment of forfeiture of these wells for the violation. Courts have no general power of amercement. The Commission's only contention in this regard being based upon the inapplicable equitable doctrine of "clean hands" we pass to a consideration of its second point.

█ This point is that the Commission's finding that the wells were not permissible as exceptions on the ground of waste or confiscation was supported by substantial evidence.

2. Appellee has pending before the Commission applications to reduce the acreage dedicated to the first four wells.

Appellee limits himself to the ground of confiscation. Hence we will not discuss waste.

In our opinion confiscation is shown as a matter of law.

The Trial Court found that appellee's property "is being confiscated by uncompensated drainage of gas from (his) property to properties belonging to others."

The need for additional wells to prevent confiscation must be based upon the right to produce so as to prevent uncompensated local drainage. 31-A Tex.Jur., p. 700.

Mr. Jack Baumel, a petroleum engineer of long experience, testified for appellee. He stated that he had investigated the bottom hole pressure of gas wells in the area where appellee's wells are located and gave detailed information as to his findings. He then gave this testimony:

"Q. (By Mr. Small) Mr. Baumel, I believe the question was, based on those figures, what is the relative condition of the pressures on the plaintiff's property, compared to the pressures on the offset wells to the north and the offset wells to the south? A. There is no doubt from those pressures that there is a differential from the plaintiff's properties and pressure gradients towards the offset wells, both in the Bethany field and what is known as the Elysian field to the north.

"Q. Now, what is the greatest magnitude of the differential as between any two wells you can see there? A. The greatest magnitude is about close to 600 pounds.

"Q. Now, in a gas reservoir under pressure, in what manner does the gas tend to move? A. It is a very well known law in physics that gas or any substance will move from a higher pressure to a lower pressure area.

"Q. In other words, the movement of the material in the reservoir is from

the area of high pressure towards the area of low pressure; is that correct? A. That is correct, yes, sir.

"Q. Then under these conditions a movement of material from the reservoir under plaintiff's properties is taking place towards the north, as well as towards the south; is that correct? A. That is correct, yes, sir.

"Q. Now, do you see any opportunity, based on those pressures, for any compensatory drainage towards the plaintiff's properties from any other property? A. No. sir, I can't visualize how the gas would migrate from a low pressure area to a high pressure area in the now existing situation.

"Q. Now, then on the December schedule the offset wells to the north on 2418 acres were allowed to produce 218 million cubic feet of gas, approximately. On 2539 acres of the plaintiff's property, he was allowed to produce 115 million cubic feet, approximately a hundred million cubic feet more to the 2418 acres to the north? A. Yes, sir.

"Q. Now, under the pressure conditions that exist there and the differential in withdrawals, as represented by the December schedule, is there any migration of gas, in your opinion, from the plaintiff's property to the offset wells to the north? A. There is no shadow of a doubt, in my opinion, that there is drainage from the plaintiff's properties to the offset properties.

"Q. If that condition of twice the per acre allowable is continued, what will be the result in regard to the movement of gas and other reservoir material from plaintiff's property? A. It will continue to migrate from the high pressure area to the low pressure area.

"Q. And will the differential in permitted production aggravate that con-

dition if it continues? A. · It will; and I might add in that connection that by comparing the cumulative with-drawals to the first of this year from all the wells which were produced in the Elysian Fields and comparing—the offset wells I am speaking of—to the wells of the plaintiff, the cumulative withdrawals to December 1 was in a ratio of almost two to one. In other words, prior to the December combination of the field, the cumulative with-drawals in cubic feet from the offset wells which we have tabulated on the graphs was in the ratio of two to one.

"Q. In other words, they have actually produced in the ratio of two to one? A. Yes, sir.

"Q. Now, then, as to the offsets to the south, which are for the most part on 640 acres, if that pressure differential exists, will the production of the four wells in question cause any migration of gas from the south towards the plaintiff's property? A. No, sir; I might further add that in analyzing the pressures in all of the wells in the Bethany field below the plaintiff's acreage, it is far, far below—the average for the whole area of the Bethany field is far, far below the average of the pressures of the four units. So no migration could ever go from a low pressure area to a high pressure area, but it would be in the other way, from the high pressure area to the low pressure area; even though the four wells were permitted, we would still get migration of gas from the high pressure area to the low pressure area.

"Q. Now, if the four wells in question are not permitted to produce and the condition is allowed to continue as it now exists, as shown by the December schedule, what, in your opinion, will be the percentage loss of recoverable reserve from underneath the plaintiff's property? A. Well, we can calculate that, I believe, by just in—

volumetrically, on the Charles N. Boyes law, by applying the pressure directly, and it will be almost in the ratio of two to one.

"Q. Two to one. In other words, the plaintiff is going to lose half of the recoverable material under his acreage in the reservoir under the present conditions? A. That is correct. Now, I might further like to clear up a point, that the first well drilled and developed in the Bethany field was in 1938, and there has been production since 1938 in the Bethany field until those wells were drilled in the early part of '54 and '55, and there has always been a pressure gradient from that area towards the wells in the Bethany field, and migration has continued all these years.

"Q. Now, under these conditions, is it necessary, in your opinion, for the plaintiff to produce these four wells if he is to have a fair chance to recover the material in the reservoir underlying his property? A. Yes, sir.

"Q. And if he is denied the right to produce these wells, will he lose gas and liquids that he would otherwise recover if he could produce the wells? A. That's correct, yes, sir."

Mr. Baumel gave much more and detailed testimony but since his testimony pertaining to drainage was in no way disputed we refrain from a further recitation of it.

The final point made by the Commission is that to allow the exceptions sought by appellee would precipitate drilling throughout the field and destroy the density rule established for it.

It appears that 16 wells were drilled in the Elysian field and 103 wells drilled in the Bethany field prior to their being combined. Since the 16 wells were drilled under the 320 acre unit rule the Commission argues that the effect of sustaining appellee's exceptions will result in 103 additional wells in the old Bethany field since it was devel-

oped under the 640 acre unit rule. Whether this prediction is accurate or not we have no way of knowing. If we accept the statement of the Commission there is an alternative. It says:

"As has been pointed out, if an adjustment need be made so that DeBardeleben will obtain his fair share of the gas produced, it should be done on the basis of allowables—either limiting the allowables for the 16 wells to the north, or increasing the allowables for the 103 wells to the south."

We must determine this case on the record before us. It shows confiscation of appellee's gas, hence the judgment of the Trial Court sustaining the validity of the wells drilled by him and granting ancillary relief is in all things affirmed.

Affirmed.