**LONE STAR GAS COMPANY, Appellant,**

v.

**J. W. MURCHISON and R. B. Sanders,**
**Appellees.**

No. 15947.

Court of Civil Appeals of Texas.

Dallas.

Jan. 5, 1962.

Rehearing Denied Feb. 2, 1962.

Roy E. Pitts, Archie D. Kroney, and Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Luther C. Johnston, Palestine, and Justice, Justice & Kugle, Athens, for appellant.

E. Tate McCain, Jr., Palestine, Wallace H. Scott, Jr., Hart and Hart, James P. Hart, Austin, for appellees.

WILLIAMS, Justice.

This appeal presents a question of first impression in Texas. The primary question presented is whether title to natural gas, once having been reduced to possession, is lost by the injection of such gas into

a natural underground reservoir for storage purposes.

Lone Star Gas Company, a natural gas public utility company, brought this suit against J. W. Murchison and R. B. Sanders, in the District Court of Henderson County, Texas, for, taking, appropriating and converting to their own use natural gas alleged to belong to Lone Star. Appellant, Lone Star, sought to recover the value of the gas taken, as well as punitive damages, and an injunction against the continuing conversion of its gas. Appellees, in their countervailing pleadings, attack the jurisdiction of the District Court of Henderson County, Texas on the theory that the cause of action asserted by appellant was, in reality, a collateral attack upon a certain Railroad Commission orders and therefore exclusive jurisdiction was vested in the District Court of Travis County, Texas perforce Art. 6049c Vernon's Ann.Civ.St. Subject to this plea, appellees leveled a number of special exceptions to appellant's petition based primarily on the proposition that appellant had lost title to the natural gas in question when same had been injected into an underground reservoir for storage purposes. The trial court overruled the plea to the jurisdiction and sustained appellees' special exceptions, holding that appellant's petition did not state a cause of action and therefore dismissed the suit. In so doing the trial court specifically held that the appellant's petition revealed that title to its gas had been lost, hence there could be no conversion. From this judgment, appellant appeals contending, in eight points of error, that the trial court erred in holding that appellant's petition failed to state a cause of action; that the court erred in holding that the appellant lost title to the gas injected for storage; that the trial court erred in holding that the rule of capture applies to gas stored by appellant in underground reservoirs; that the court erred in sustaining various special exceptions; and that the court erred in dismissing appellant's suit. Appellees, by counterpoints one and two, contend that the

trial court was correct in dismissing appellant's suit because there was no jurisdiction of the subject matter and further that appellant's petition had failed to state a cause of action. By cross-point appellees assail the action of the trial court in overruling their plea to the jurisdiction.

We have concluded that the pivotal question presented by this appeal is propriety of the trial court's action in holding that Lone Star's pleadings failed to state a cause of action and in dismissing the suit. Accordingly, we consider first appellant's points one through eight, and in doing so we must necessarily center our attention upon the petition. There are no disputed facts presented for determination. Since the Court below disposed of this case by sustaining special exceptions the facts alleged by Lone Star in its pleadings must be taken as true. Grimes v. Talbot, Tex.Civ. App., 233 S.W.2d 206; City of San Antonio v. Earnest, 144 Tex. 83, 188 S.W.2d 775. The petition is best presented by copying same haec verba:

### THE PETITION

"Now comes the plaintiff, LONE STAR GAS COMPANY, a corporation organized under the laws of the State of Texas with its principal office in Dallas, Texas, complaining of the Defendants, J. W. Murchison and R. B. Sanders, both of whom reside in Henderson County, Texas, and for cause of action respectfully shows:

"I.

"Plaintiff is a natural gas public utility and is engaged in the business of transporting and distributing natural gas to the public and serves a large area of consumers of gas for domestic, commercial and industrial uses. The demand for gas fluctuates so that during each year there are periods of very high demand for gas by consumers served by Plaintiff and periods of very low demand. By stor-

ing gas during periods of low demand and withdrawing the same during the periods of high demand Plaintiff can efficiently meet the peak demands of the consumers on its system and at the same time furnish a more constant and uniform outlet for producers of gas. By storing gas, Plaintiff, during periods of low consumer demand, can purchase larger quantities of gas from gas wells, and larger quantities of casinghead gas produced from oil wells, and thus improve the market for gas and help prevent the waste of casinghead gas. The only feasible and the safest method of storing gas is underground storage. For storing gas Plaintiff uses underground storage in areas geographically and geologically situated so as to allow gathering and storage of surplus gas during low demand periods and the withdrawal and transportation thereof to the consumers on Plaintiff's system in periods of high or peak demand.

"II.

"The Tri-Cities Bacon Lime Field, situated in Henderson County, Texas, is an exhausted gas field lying below the depth of 7,500 feet and constitutes a reservoir suitable for storing gas. Gas produced elsewhere can be injected therein for storage and later withdrawn as the need arises. When production of gas from said field was commenced in the year 1942, said field then contained approximately 22.5 million MCF of gas placed in such reservoir by natural forces and referred to herein as 'native gas'. The abbreviation 'MCF' as used in this petition is an abbreviation meaning 1,000 cubic feet. After production was commenced from said field many wells were drilled therein which produced gas therefrom and withdrew the native gas from said Bacon reservoir; and on April 23, 1956, and effective April 9, 1956, the Railroad Commission of Texas made and entered its order classifying said Bacon field as a gas storage reservoir, and a copy of said order is attached to this petition and marked Exhibit 'A', and by reference incorporated herein and made a part hereof as though set out in full herein.

"III.

"Before commencing the storage of of gas as hereinafter alleged, Plaintiff acquired and ever since has been and now is the owner of and in possession of all the wells in said Bacon Lime Field (hereinafter sometimes called 'Bacon storage reservoir') and the leases upon which said wells were drilled insofar as they covered, among other formation, said Bacon Formation. By instrument effective on or about January 1, 1956, the persons then owning said leases, together with the owners of the land covered thereby, and the owners of the minerals subject to said leases, entered into a unit operating agreement with Lone Star Producing Company granting to said company, among other things, the right to inject extraneous gas and store the same in said Bacon storage reservoir, and prior to the Railroad Commission order alleged above herein Plaintiff acquired and ever since has been and now is the owner of all the rights of Lone Star Producing Company under said unit operating agreement. After said order of April 9, 1956, was made by the Railroad Commission of Texas classifying said Bacon Field as a gas storage reservoir Plaintiff expended over $2,000,000.00 in installing equipment annd facilities to use said Bacon storage reservoir for the storage of gas. In November 1956, Plaintiff commenced and has thereafter continued to inject in said Bacon storage reservoir extraneous gas belonging to Plaintiff and in Plaintiff's possession in Plaintiff's pipe lines. 'Extraneous gas' as used in this peti-

tion means gas which was not produced from said Bacon Lime Field but produced elsewhere and acquired and owned by Plaintiff. All of the extraneous gas injected by Plaintiff in said Bacon storage, reservoir, as alleged in this petition, was gas in Plaintiff's pipe line acquired by Plaintiff from other sources and was injected by Plaintiff in said Bacon storage reservoir for storage purposes in order that Plaintiff would have gas in storage to withdraw to meet the demands of consumers served by plaintiff in times of high demand. Plaintiff after commencing such gas injection has from time to time withdrawn gas from said reservoir to meet the demand of consumers served by Plaintiff. After Plaintiff commenced injecting gas in said Bacon storage reservoir no withdrawal of gas have been made by anyone other than Plaintiff except the Defendants in 1959 commenced and have continued to take and appropriate extraneous gas stored in said reservoir by Plaintiff as hereinafter alleged.

"IV.

"The tract of land of 89.05 acres, more or less, in Lot No. 12 in the Jacob Tator Survey, Henderson County, described in that certain oil and gas lease dated September 15, 1958, made by W. W. Jackson and wife, as lessors, to J. W. Murchison, as lessee, and recorded in Volume 37, Page 407, Lease Records of Henderson County, Texas, is herein referred to as 'said Jackson tract'. Said Jackson tract lies in the Southwest part of said Bacon storage reservoir, and a small portion of said reservoir extends under said Jackson tract. In 1956 when Plaintiff commenced storing gas in said Bacon storage reservoir no well had ever been drilled on said Jackson tract. Said Jackson tract was not then under an oil and gas lease, and Plaintiff did not acquire a lease on said Jackson tract,

and the owners of said Jackson tract were not parties to the unit operating agreement alleged above in paragraph III hereof.

"V.

"In September of 1958 the Defendant J. W. Murchison obtained from W. W. Jackson and wife, as lessors, an oil and gas lease covering said Jackson tract, the lease dated September 15, 1958, and referred to above herein. And thereafter said Defendant Murchison assigned an interest in said lease to the Defendant R. B. Sanders. By the end of November 1958, Plaintiff had injected for storage a cumulative net total of 19,034,479 MCF of gas in said Bacon storage reservoir (over and above the amount withdrawn from said storage reservoir by Plaintiff) all of which 19,034,479 of gas constituted extraneous gas contained in said Bacon storage reservoir which had been injected by Plaintiff for storage and belonged to Plaintiff, there being no native gas then left in said reservoir. Soon thereafter, in December 1958, Defendants commenced a well on said Jackson tract and thereafter drilled the same into the Travis Peak Formation, lying below the Bacon Formation, and at a depth of approximately 8,400 feet Defendants completed said well as a small producing gas well in the Travis Peak Formation. This well, drilled by Defendants, went through said Bacon Storage Reservoir; and in May, 1959, Defendants tapped said Bacon storage reservoir by perforating the casing in said well in said Bacon storage reservoir, and Defendants then commenced and have continued to take large quantities of gas from said gas Bacon storage reservoir and sell the same. None of the gas taken by Defendants from said Bacon storage reservoir is native gas; all of the native gas originally contained in said reservoir had been produced from said reservoir long

before Defendants commenced taking gas therefrom, and no person other than Plaintiff has injected any gas in said Bacon storage reservoir. The gas so taken and appropriated from said Bacon storage reservoir by the Defendants is extraneous gas belonging to Plaintiff stored by Plaintiff in said Bacon Storage reservoir as hereinabove alleged. Neither of the Defendants has injected any gas in said Bacon storage reservoir, but Defendants have taken and appropriated from said storage reservoir through said well and converted many millions cubic feet of said extraneous stored gas belonging to Plaintiff, the exact amount of which is not known to Plaintiff but is well known to the Defendants, all to the Plaintiff's damage in the amount of $37,000.00; and in this connection Plaintiff alleges that Defendants have so taken and converted an amount of gas having a reasonable market value in excess of $37,000.00 and having a value to Plaintiff above said amount.

"VI.

"Defendants have sold said gas taken and appropriated by them as alleged above and retained the proceeds therefrom for themselves. In the alternative Plaintiff says that Defendants have thus been unjustly enriched at the expense of the Plaintiff to the extent of the value of said gas taken and appropriated by Defendants from said Bacon storage reservoir and that the Defendants should be compelled to account to Plaintiff for the proceeds of the sale of the gas, the exact amount of which is well known to the Defendants.

"VII.

"Defendants acted wilfully, wantonly, intentionally, and maliciously in tapping said gas storage reservoir and in taking, appropriating and converting to their own use the extraneous gas stored therein by Plaintiff, as hereinabove al-

leged, and Plaintiff is entitled to punitive or exemplary damages from Defendants in the amount of $75,000.00.

"VIII.

"Defendants have continued to take and appropriate said extraneous gas stored by Plaintiff in said Bacon storage reservoir and have threatened to continue, and Plaintiff is informed and believes Defendants will continue to do so unless restrained by this honorable court. Plaintiff does not have an adequate remedy at law to prevent such continued and multiple takings by Defendants, and Plaintiff is therefore entitled on final hearing to an injunction permanently enjoining Defendants from taking such gas."

Plaintiff's prayer was for the value of the extraneous gas taken by defendants and converted by them, as alleged, also recovery on the theory of unjust enrichment, for exemplary damages and a request for permanent injunction.

TRIAL COURT'S JUDGMENT.

The trial court, in the material portion of his order said:

"The Court is of the opinion that Plaintiff as a matter of law lost title to the gas injected for storage by Plaintiff in the Bacon Lime Storage Reservoir when it migrated under the Jackson tract and was produced by Defendants from their well on the Jackson tract. Hammonds v. Central Kentucky Natural Gas Co., 255 Ky. 685, 75 S.W. 2d 204. The rule of capture as stated in Brown v. Humble Oil & Refining Company, 126 Tex. 296, 83 S.W.2d 935, [87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393] applies to the gas injected by Plaintiff for storage. Therefore, the Court finds that Plaintiff's petition fails to state a cause of action, and the Defendants' exceptions to Plaintiff's petition must be sustained."

## OPINION

It is of utmost importance to understand that we are not here dealing with natural gas as it exists in its natural state. We are concerned here with what is known as "extraneous gas" which means gas which has been produced elsewhere, acquired and owned by Lone Star and then, for purposes of storage, injected into the Bacon storage reservoir underlying about 4,000 acres in Henderson County, pursuant to authority of the Railroad Commission of Texas. A distinction which must be applied between the status of natural gas, as such, and "extraneous gas", as defined, is a controlling feature of this appeal. The law of Texas relating to the original capture of natural gas from underlying structures is well settled by the Supreme Court in Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A. L.R. 1107, 101 A.L.R. 1393. On the other hand the direct question of ownership and status of extraneous gas has never been presented to Texas Courts. It is of paramount importance, in approaching this question, to bear in mind the nature of the suit by Lone Star. The action is simply one seeking damages and redress from the conversion of gas which appellant contends is its personal property. Nothing more is here presented. Appellees expend a great deal of space in their brief to the argument that appellant has trespassed upon their property. The status of this record is such, however, that we must, as Ulysses "lash ourselves to the mast and resist Siren's songs" of trespass, or similar contention. This, for the simple reason that no action seeking redress or claimed trespass is here presented. The simple question upon determination is one of title and ownership, i. e., did the title and ownership of the extraneous gas herein involved, which appellant acquired and stored in the underground reservoir for use, pass from appellant to appellees?

The case relied upon by the trial court, and the one which appellees ask us to embrace as the law of Texas, is Hammonds v. Central Kentucky Natural Gas Company, 255 Ky. 685, 75 S.W.2d 204, decided in 1934 by the Court of Appeals of Kentucky. In that case the defendant, Gas Company, had exhausted a gas field of about 15,000 acres and then brought in gas from distant fields and stored in this exhausted reservoir. Hammonds owned 54 acres within this field which was never leased to the gas company. Plaintiff brought suit to recover for use and occupation on the theory of trespass. The court first admitted that natural gas, when severed and brought under dominion and into actual possession at the surface, becomes the personal property of the one who has extracted it under a right to do so. The question, said the Kentucky Court, is whether that gas, having once been reduced to possession and absolute ownership having vested, was restored to its original wild and natural status by being replaced in a similar reservoir or nature, taking the place of other gas which once occupied that same subterranean chamber. The court, applying the doctrine of animals ferae naturae, reasoned, as follows:

"In seeking for an analogous condition in the law, the courts, since the early Pennsylvania case, have compared natural gas and oil to that of animals ferae naturae. The analogy, as we have seen formed the basis of the all but universal doctrine of property in these wandering minerals. So we may look to that analogous law. From the beginning, wild animals have been regarded as quasi property of the entire human race. It is the recognition of land titles rather than of any individual property in the game that prevents its pursuit, and, barring all questions of trespass, exclusive property in birds and wild animals becomes vested in the person capturing or reducing them to possession. But unless killed, this is a qualified property, for when restored to their natural wild and free state, the dominion and individual proprietor ship of any person over them is at an end and they resume their status as

common property. 3 C.J. 18, 19. So, too, are fish collective property so long as they remain unconfined in their natural element in a public stream, and not even the owner of the soil over which the stream flows owns the fish therein, although he may have the exclusive right of fishing in the stream where it runs over his land. *And, as in the case of wild game, a qualified property in an individual may be acquired by catching and confining fish within a private pond so they cannot escape.* If, however, the fish escape and are found at large in their proper element, they again become public property and are subject to appropriation by the first person who takes them. 26 C.J. 597.

> "If one capture a fox in a forest and turn it loose in another, or if he catch a fish and put it back in the stream at another point, has he not done with that migratory, common property just what the appellee has done with the gas in this case? Did the company not lose its exclusive property in the gas when it restored the substance to its natural habitat?" (Emphasis supplied).

Concluding that the gas company had lost its title to the gas which had been reinjected, the court said:

> "We are of the opinion, therefore, that if in fact the gas turned loose in the earth wandered into the plaintiff's land, the defendant is not liable to her for the value of the use of her property, for the company ceased to be the exclusive owner of the whole of the gas—it again [becomes] mineral ferae naturae."

The Hammonds case was followed by the same court in Central Kentucky Natural Gas Co. v. Smallwood, Ky., 252 S.W.2d 866 and by dictum in Protz v. Peoples Natural Gas Co., 93 Pittsb.Leg.J. 239, aff. 94 Pittsb. Leg.J. 139. It was cited with approval in West Edmond Salt Water Dist. Ass'n v. Rosecrans, 204 Okl. 9, 226 P.2d 965 in a case following the disposal of salt water by reinjection.

Hammonds, in its application of ferae naturae doctrine, has been the subject of violent adverse criticism by many authors and law review writers.

Summers, "Oil and Gas", permanent Ed. Vol. 1, p. 173, states:

> "All of these analogies of oil and gas to solid minerals, in subterranean waters, and to animals ferae naturae are false, for the reason that the physical and economical facts of oil and gas from which the legal relations of the landowner respecting them are actually determined, are different from the physical and economic facts of the substances with which they are compared."

In 21 U.Kan.City L.Rev. 217, 220 (1954), the author says:

> "If the law pertaining to minerals in this country is to retain its stability and uniformity, it is mandatory that this vicious analogy between natural gas and animals ferae naturae which has reared its ugly head be destroyed without delay."

In 36 Va.L.Rev. 947 (1950), it was said:

> " * * * the public has an undoubted interest in the production and distribution of fuel gas. The health and well-being of great numbers of people are involved and can not be postponed to the selfish desires of a few. Since the efficient and economical distribution of natural gas in many areas demands its storage in exhausted strata, the strata must be made available."

One of the most distinguished and outstanding authorities on oil and gas law in Texas, A. W. Walker, Jr., in 16 Tex.L.Rev. 370 said:

> "It is unfortunate that our law as to oil and gas developed before scientific information was available as to the exact nature of oil and gas reservoirs.

Throughout all of the earlier decisions are to be found statements indicating the prevailing erroneous opinion that oil and gas in their natural state possessed the quality of free migration. Even as late as 1921, one of the Texas courts indulged in the fanciful statement that oil and gas 'are supposed to percolate restlessly about under the surface of the earth, even as the birds fly from field to field and the beasts roam from forest to forest'.

"In the absence of common-law precedent, and without the benefit of scientific information, it is not surprising that the courts sought by analogy to compare oil and gas to other types of property such as wild animals, subterranean waters, and solid minerals, with reference to which there was ample common-law precedent upon which to determine property rights. These ugly analogies in the light of modern scientific information have been disproven, and the courts have come to recognize that oil and gas, as commonly found in underground reservoirs are really sui generis, and we are rapidly developing a special jurisprudence adapted to the peculiarities of these particular minerals."

William Jarrell Smith, another outstanding authority on oil and gas litigation, speaking on the subject "Rights and Liabilities on Subsurface Operations", Eighth Annual Institute on Oil and Gas Law and Taxation, Southwestern Legal Foundation, said:

"It seems to me that this ferae naturae doctrine has long since served its purpose. Back in the days when people did not have such concept of subterranean conditions, it could be excused. * * * If you are going to use the animal theory, then it seems to me that we are dealing with a domestic animal. If a horse strays over on a neighbor's land, the neighbor may be entitled to his damages, but he does not, by virtue of the trespass, acquire title to the horse."

For similar criticism see 13 Tex.L.Rev. 378; 41 W.Va.L.Quarterly 431; 48 Harvard L.Rev. 855; Kulp, "Oil and Gas Rights" p. 526; Stamm, "Legal Problems in the Underground Storage of Natural Gas"; 36 Tex.L.Rev. 161; 19 Minn.L.Rev. 483; Woodward, "Recent Developments in the Law of Oil and Gas"; 1961 proceedings of the Section of Mineral & Natural Resources Law, Am.Bar Association.

It was not until 1960, 26 years following Hammonds, that we find an adjudicated case which repudiates the holding of the Kentucky Court. In White v. New York State Natural Gas Corp. et al. (U.S.Dist. Ct.Western Dist. of Pa.), 190 F.Supp. 342, plaintiff, as owner of an interest of the proceeds from the sale of gas produced by certain wells in Pennsylvania brought suit to restrain the restriction of production. The defendant Gas Company admitted that it was curtailing production, but alleged in defense that the native reserve gas had been exhausted from the drainage area of the wells, and that present production was of storage gas which had migrated from adjoining fields and defendant therefore contended that the production of this gas for the plaintiff's benefit would be a wrongful taking of the gas belonging to the storage companies. Plaintiff countered that such would not constitute a defense claiming, under the doctrine of animal ferae naturae, that the injector of gas into a natural underground reservoir loses title to the gas. The court refused to follow the Kentucky authority on Hammonds, saying:

"The pivotal issue in this case is whether title to natural gas, once having been reduced to possession, is lost by the injection of such gas into a natural underground reservoir for storage purposes.

" * * * application of the ferae naturae analogy apparently has been limited to the original 'capture' of na-

tive gas and oil. Insofar as title to gas and oil in place is concerned, the Supreme Court has long considered as firmly established the rule that ' * * oil and gas are minerals, though not commonly spoken of as such, and while in place are part of the land' (Kier v. Peterson, 41 Pa. 357, 362 * * *); * * *.

"*Once severed from the realty, however, gas and oil, like other minerals, become personal property.*

"* * * *title to natural gas once having been reduced to possession is not lost by the injection of such gas into a natural underground reservoir for storage purposes.*" (Emphasis ours.)

The decision in the White case has been the subject of a recent law review discussion by Reasoner entitled "Injector of Natural Gas into a Natural Underground Reservoir Retains Title to the Gas". 40 Tex. L.Rev. #2, pp. 290–294, wherein the author says:

"The court's decision is an eminently sound one. The analogy between oil and gas and animals ferae naturae is inappropriate and should not be allowed to result in decisions which would needlessly hinder an industry so vital to the economy as the underground storage of natural gas. In contrast with animals, oil and gas are inanimate, insentient, and move only in accordance with the physical laws of gravity and pressure. They are not 'wandering and fugitive' but collect in reservoir traps where they almost invariably stay until man interferes with them. Moreover, natural gas, unlike wild animals, is the basis of one of the country's largest and most vital industries.

"The policy arguments in favor of the court's decisions are extremely strong. It has become essential to build up a large storage reserve in the summer months to meet the heavy demands of the northern cities which are thousands of miles from the gas fields of the Southwest. Natural underground reservoirs are the only economically feasible way to store such reserves. The public's vital concern with such storage is evidenced by the fact that numerous states have passed 'underground storage condemnation' statutes. In addition, at least three states have passed statutes which state explicitly that the injector of natural gas retains title to it. Thus the decision is clearly in the public's interest, in that it removes a prospective hinderance to the utilization of exhausted gas fields for storage reservoirs.

"The legal problems resulting from underground storage of gas are far from resolved. This case is, however, a very salutary step in overcoming the psuedo-logical analogy of the Hammonds case and in bringing the realistic approach to problems in this area which the complex necessities of our industrial society require."

Several states have enacted legislation which provides explicitly that the injector of natural gas retains title thereto. Colo. Rev.Statutes Ann., Chp. 100, § 100–9–7; Mo.Ann.Statutes Title 25, § 393.500; Okla. Statutes Ann. Title 52, § 36.6 (1960).

Appellees seeking to apply the analogy of percolating waters, rely upon Rock Creek Ditch & Flume Co. v. Miller, 93 Mont. 248, 17 Pac.2d 1074, 80 A.L.R. 200, where it was held that the person had reduced water to possession lost his title to it when it was allowed to go into the ground and become a part of the percolating water. We find no valid analogy between percolating waters and stored gas. Our Supreme Court, in passing upon a similar question, in Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d 558, 4 A.L.R.2d 191, said:

"In the absence of common law precedent, and owing to the lack of scientific information as to the movement

of these minerals, some of the courts have sought by analogy to compare oil and gas to other types of property such as wild animals, birds, subterranean waters and other migratory things, with reference to which the common law had established rules denying any character of ownership prior to capture. * * *

"In the light of modern scientific knowledge these early analogies have been disproven, and courts generally have come to recognize that oil and gas, as commonly found in underground reservoirs, are securely entrapped in a static condition in the original pool, and, ordinarily, so remain until disturbed by penetration from the surface."

The question of title to waters which have been captured and placed in a drainage ditch was passed upon in Harrell v. F. H. Vahlsing, Inc., Tex.Civ.App., 248 S.W.2d 762, wherein an opinion by Justice Norvell, now on the Supreme Court, it was held that one who had captured water and placed it in a drainage ditch did not lose title thereto.

For an interesting discussion of the question of title to water in such a situation see Weil "Water Rights" (3rd Ed.) § 38.

■ There can be no doubt that gas which has been produced is personal property. Thus, in 31–A Tex.Jur. 27, it is said: "When oil or gas is removed from the soil it becomes personalty." Chaffin v. Hall, Tex.Civ.App., 210 S.W.2d 191; Stephens v. Stephens, Tex.Civ.App., 292 S.W. 290; 98 C.J.S. Witnesses § 415, p. 218; 24 Am. Jur. 519–20.

■ Assuming the existence of title to the gas as personal property while held above the ground by the owner the question remains does such ownership cease by the act of the owner in storing it in a well-defined storage reservoir. The owner of personal property does not lose his title thereto by not having the property on his person or on his land unless there is aban-

donment, and abandonment requires an intent to abandon, which is not present in this case. In 1 Tex.Jur. 10, it is said: "The doctrine of abandonment rests primarily on intention. Indeed, it is common in cases dealing with this subject to find it said that abandonment is a question of intention. Accordingly there must have existed an intention to abandon before property or a right therein can be lost." Contrary to the theory of abandonment we find in this record a positive statement of intention on the part of appellant to reclaim its gas as it is needed to satisfy the demand of consumers during times of high fuel consumption.

■ From the available authorities on this subject and based upon what we consider to be sound and logical reason, especially in the light of advanced knowledge and scientific achievement in the oil and gas industry, we are of the opinion that the rule of the Hammonds case should not be embraced as the law in Texas. An exegesis of the Hammonds opinion, when considered in the light of present day development of the gas industry, is unimpressive. The analogy of wild animals upon which Hammonds is founded fails to undergird the ultimate decision of that case. Gas has no similarity to wild animals. Gas is an inanimate, diminishing non-reproductive substance lacking any will of its own, and, instead of running wild and roaming at large as animals do, is subject to be moved solely by pressure or mechanical means. It cannot be logically regarded as personal property of the human race as are wild animals, instead of being turned loose in the woods as the fanciful fox or placed in the streams as the fictitious fish, gas, a privately owned commodity, has been stored for use as required by the consuming public being, as alleged by appellant, subject to its control and withdrawal at any time. Logic and reason dictates the application of the White decision rather than Hammonds, to the end, that in Texas, the owner of gas does not lose title thereof by storing the same in a well-defined underground reservoir. It fol-

lows, therefore, that the trial court was in error in applying the Hammonds doctrine and thereby holding that Lone Star had lost title to its gas by storing it.

As noted, the trial court also cited Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 101 A.L.R. 1393 in support of this judgment, thereby holding that the rule of capture as stated in Brown also applies to gas injected for storage. The case of Brown v. Humble Oil & Refining Co., (Supra), does not involve stored gas, but is a rule 37 case involving a permit to drill a well in the East Texas Oil Fields. The Supreme Court, in a comprehensive opinion, discusses the Texas law which recognizes the ownership of oil and gas in place and gives to the lessee a determinable fee therein. There has never been a serious question raised concerning this law in Texas, but it must be remembered that the decision relates only to the *original capture* of gas and has no proper application to the factual situation under consideration, i. e., gas which has been *originally captured and subsequently restored.*

Cases cited by appellees such as Corzelius v. Harrell, 143 Tex. 509, 186 S.W.2d 961; Elliff v. Texon Drilling Co., 146 Tex. 575, 210 S.W.2d 558, 4 A.L.R.2d 191; Ryan Consolidated Petroleum Corp v. Pickens, 155 Tex. 221, 285 S.W.2d 201, all deal with the law of original capture and hence not applicable to the factual situation here presented. We have been cited no case by appellees in Texas holding that the doctrine of original capture applies with equal force to stored gas. It is our opinion that the trial court erred in applying the rule of original capture to a situation as presented here.

■ From what we have said it seems obvious to us that the trial court committed error in holding that Lone Star had failed to state a cause of action, and sustaining the special exceptions to the pleadings and in dismissing plaintiff's lawsuit. Appellant's first through eight points are sustained.

We turn now to a consideration of appellees' cross-point wherein it is seriously contended that the District Court of Henderson County, Texas had no jurisdiction to hear and determine this case.

As related above, Lone Star's petition alleged that the Railroad Commission conducted a hearing on the question of whether Lone Star should be authorized to conduct gas storage operation in the Bacon Lime Reservoir in the Tri-Cities Field. Having found that this reservoir was suitable for underground gas storage operations, the Railroad Commission, on April 23, 1956 issued its order providing detailed regulation of wells for injecting gas into that reservoir, a portion of which extended under the 89.05 acre tract known as the Jackson Lease upon which the Lone Star affirmatively pleaded it did not have a lease. Lone Star alleged that, pursuant to the Railroad Commission's order referred to, it began to conduct a program for the injection of gas into the Bacon Lime Reservoir. Thereafter, in December 1958, the appellees commenced to drill a well on the Jackson Lease, first completing it in the Travis Peak Formation and thereafter, also completing it in the Bacon Lime Reservoir and began the production of gas from such well. It was this gas that Lone Star alleged belonged to it and for which it asked judgment for payment and damages. Upon the hearing on the plea to the jurisdiction filed by appellees, testimony was introduced in the trial court revealing that on March 23, 1959, Lone Star protested to the Railroad Commission against the application of appellees for permission to dually complete their Jackson well, one of the completions to be in the Bacon Lime zone. After hearing, the Railroad Commission denied Lone Star's protest and approved the application of appellees to dually complete their Jackson well, a part of which being in the Bacon Lime zone. The record also shows that Lone Star next filed an application with the Railroad Commission seeking an amendment to rules relating to the Bacon Lime Reservoir or in the Tri-Cities Field, the effect of such appli-

cation being to seek a regulation of production from the Bacon Lime Reservoir so that the correlative rights and property may be protected. Following a hearing the Railroad Commission denied Lone Star's application for an additional field rules or amendments. Appellees contended in the trial court, and contends here, that Lone Star's remedy, if any, lay in appeals from such Railroad Commission's orders to the District Court of Travis County, Texas pursuant to § 8, of Art. 6049c Vernon's Ann.Civ. St., and that, having failed to appeal therefrom, appellant is precluded from bringing this suit in the District Court of Henderson County, Texas relying upon such authorities as Railroad Commission v. DeBardeleben, Tex.Civ.App., 297 S.W.2d 203, aff. 157 Tex. 518, 305 S.W.2d 141; Railroad Commission of Texas v. Texas Company, Tex.Civ.App., 298 S.W.2d 666; Dailey v. Railroad Commission, Tex.Civ.App., 133 S. W.2d 219; Corzelius v. Harrell, Tex.Civ. App., 179 S.W.2d 419; Alpha Petroleum Co. v. Terrell, 122 Tex. 257, 59 S.W.2d 364; Magnolia Petroleum Co. v. Edgar, Tex.Civ. App., 62 S.W.2d 359; West Texas Compress & Warehouse Co. v. Panhandle & S. F. Ry. Co., Tex.Com.App., 15 S.W. 558 and Texas Steel Co. v. Fort Worth & Denver City Ry. Co., 120 Tex. 597, 40 S.W.2d 78. These cases deal primarily with spacing rules, permits, and regulatory orders which we deem are not analogous to the factual situation here.

The statute relied upon by appellees, Art. 6049c § 8, Vernon's Ann.Civ.St. provides that any interested person affected by any rule, regulation or order of the Railroad Commission shall have the right to file a suit in a court of competent jurisdiction in Travis County, Texas, and not elsewhere, against the Commission, or the members thereof, as defendants, *to test the validity of said rules, laws, regulations or orders.* It is immediately apparent that this suit is not one brought under § 8 of Art. 6049c to review any Railroad Commission order, rule or regulation. Lone Star's petition does not seek to annul or set aside any rule or order

of the Commission, nor is the Railroad Commission or the members thereof, parties to this suit. No relief is sought against the Commission or any of its members. The petition reveals nothing more than a common law cause of action for conversion of property and a prayer for damages. No question of venue is here presented inasmuch as it is undisputed that the appellees are residents of Henderson County, Texas.

■ In determining the question for jurisdiction the allegations of plaintiff's petition are to be taken in good faith and determinative of the cause of action. Brannon v. Pacific Employers Ins. Co., 148 Tex. 289, 224 S.W.2d 466. See also Jones v. Maples, Tex.Civ.App., 184 S.W.2d 844, writ ref.; Ellis v. Houston & T. C. Ry. Co., Tex.Civ. App., 203 S.W. 172, Writ Ref., and Hilley v. Hilley, Tex.Civ.App., 305 S.W.2d 204, writ ref. n. r. e.

■■ This suit is one for adjudication concerning the title and ownership of gas. Simply stated, appellant says it owns the gas which has been taken by appellees. The appellees say that appellant has lost its title to the gas. The Railroad Commission of Texas has no jurisdiction to adjudicate ownership of property and we find no authority which justifies the usurpation by the Railroad Commission of the rights of courts in this regard. We find nothing in the orders of the Railroad Commission relied upon by appellees to attempt to determine the title controversy presented by the pleadings here. The Railroad Commission is nothing but an administrative body appropriately clothed with authority to perform salutary functions of economic nature for the conservation of natural products. Its function is to administer conservation laws only and not to take the place of courts in their historical jurisdictional field.

The Supreme Court in Magnolia Petroleum Co. v. Railroad Comm., 141 Tex. 96, 170 S.W.2d 189 said:

"The function of the Railroad Commission in this connection is to admin-

**882**

ister the conservation laws. When it grants a permit to drill a well it does not undertake to adjudicate questions of title or rights of possession. These questions must be settled in the courts.''

The question of jurisdiction presented by appellees is untenable and must be overruled. Whelan v. Placid Oil Co., Tex.Civ.App., 274 S.W.2d 125; F. A. Gillespie & Sons v. Railroad Commission, Tex.Civ.App., 161 S. W.2d 159; Pan American Production v. Hollandsworth, Tex.Civ.App., 294 S.W.2d 205; Pan American Petroleum Corp. v. Railroad Commission, Tex.Civ.App., 318 S. W.2d 17; Novak v. Brunner, Tex.Civ.App., 320 S.W.2d 439; Nugent v. Freeman, Tex. Civ.App., 306 S.W.2d 167; Ryan Consolidated Petroleum Corp. v. Pickens, 155 Tex. 221, 285 S.W.2d 201; 31-A Tex.Jur. § 430, p. 756.

The judgment of the trial court is reversed and remanded for trial on the merits.

YOUNG, J., not sitting.